**EMERYVILLE RESEARCH CENTER, SHELL DEVELOPMENT COMPANY, a division of Shell Oil Co., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 23833.

United States Court of Appeals, Ninth Circuit.

April 14, 1971.

David M. Heilbron (argued), William W. Schwarzer, of McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for petitioner.

Ian D. Lanoff (argued), Paul J. Spielberg, Attys., Marcel Mallet-Prevost, Asst. Gen., Counsel, Dominick L. Manoli, Associate Gen. Counsel, Arnold Ordman, Gen. Counsel, N. L. R. B., Washington, D. C., Roy O. Hoffman, Director, N. L. R. B., San Francisco, Cal., Norback & Law, San Mateo, Cal., for respondent.

Before JERTBERG, DUNIWAY and TRASK, Circuit Judges.

DUNIWAY, Circuit Judge:

Emeryville Research Center (the Company) petitions to review and set aside an order of the National Labor Relations Board. The Board found that the Company's failure to furnish information requested by the Association of Industrial Scientists (the Union) was a "refusal to bargain collectively in good faith" in violation of section 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1). The Board cross-petitions for enforcement of its order. We set the Board's order aside.

The Board ordered the Company to cease and desist from refusing to bargain collectively by refusing to furnish the Union:

"A written explanation of salary guide curves used by [the Company] in fixing salaries, and copies of current guide curves and copies of guide curves prepared for the five previous years.

"Merit ratings for employees in the bargaining unit for January 1 and July 1 each year for the period 1962 through 1966.

"A list unidentified by name showing individual salaries of employees in the bargaining unit, merit ratings, academic degrees, principal type of scientific or related work engaged in since preparation of previous lists as of January 1, 1967, and thereafter on the anniversary of such dates."

The items of information covered by the Board's order are components of the salary administration system which the company uses to determine individual salaries of some 430 professional scientists and engineers in the bargaining unit, who are employed to do scientific research at the Company's Emeryville, California center. According to the collective bargaining agreement, the Company retains the right unilaterally to determine individual merit salaries. The Company's salary system is rather sophisticated. Each employee is assigned a subjective merit rating by his supervisor and an experience credit based in part on his level of education and in part on his work experience in his field of specialization. The guide curves are derived from a salary survey of eleven competitive research companies. There are nine guide curves which define ten merit bands. Projection of the guide curves on paper, with experience credit on the horizontal axis and salary level on the vertical axis, shows the salary range for each employee. Although the Union has never bargained about individual salaries, it has a contractual right to assent to across-the-board general salary increases and has actively bargained for such increases. The bargaining history also reveals that the Company has supplied the Union with a substantial amount of salary data, some of it required by the agreement and some not.

The current dispute arose in contract negotiations in the Fall of 1966. The Union presented a proposal to modify the salary article of the collective bargaining agreement by requiring the Company each year to supply (1) a copy of the salary guide curves to be in effect for the ensuing year and (2) two lists,

unidentified by name, showing individual salaries and merit ratings for all employees by experience credit groups as of January 1 and July 1. The second proposal differed from the existing salary article only in the inclusion of merit rating data and the provision for semi-annual lists.

The Union was unable to persuade the Company to accept its proposed modifications, and on January 30, 1967, the agreement was executed with the salary article unchanged. The same day the Union submitted a letter to the Company renewing and broadening its request for information. In addition to the information sought in the modification proposal, the Union requested a written explanation of the guide curves, the curves for the previous five years, and the inclusion of academic degrees in the salary and merit rating lists.

The Company replied on February 13. Enclosed with the letter was the current salary information then required by the agreement. With respect to the additional information requested, the Company expressed its concern over the amount of effort that would be required to compile it and the danger that some of the data requested might tend to reduce the anonymity of the data already being supplied. The Company nonetheless offered to meet with the Union to discuss the relevance of the requested data to the current negotiations.

A meeting was held for that purpose on February 21. Although the record is quite sketchy as to what happened at that meeting, it appears that the Company asked the Union to state specifically why it needed the requested information so that the parties could work together to put the information into a form which would meet the Union's needs and at the same time satisfy the Company's objections. The Union, apparently, did not explain its reasons beyond stating, in substance, that it needed the information in order to bargain intelligently. The meeting yielded no significant progress toward a settlement of the dispute.

One week later, on February 27, the Union presented the Company with a letter that amounted to a demand. The Union restated its insistence that the requested data was reasonably necessary for it to bargain intelligently and advised the Company that unless it produced the data within one week, or within that time set a future date for its production, the Union would proceed before the Board.

 The Company replied by letter on March 7. First, the Company pointed out that the Union had already received one written and two oral explanations of the guide curves. Next, the Company explained in detail its objections to providing the remaining requested data. With respect to the merit ratings, the Company noted that supervisors were included in the merit rating system and that to divulge merit ratings for Union employees would necessarily also divulge supervisor merit ratings. Nevertheless, the Company offered to review the possibility of devising a rating system excluding supervisors so that merit rating data could be supplied to the Union without revealing supervisor ratings. With respect to the guide curves, the Company argued that their production would jeopardize the Company's entire salary system. The guide curves are derived from salary information obtained in confidence from eleven competitive research companies. The Company feared that if it could no longer assure the confidentiality of the salary survey data, the companies in the survey would cease to participate and the salary system would be destroyed. With respect to academic degrees the Company objected on two grounds. First, a considerable amount of clerical data would be required to compile it. Second, inclusion of academic degrees along with salaries and experience credit would make it easier to identify the salaries of individual employees and thus reduce the anonymity of the data already being supplied. Finally, the Company did not flatly refuse to furnish the information re-

quested. It repeated its request that the Union specify its needs in the light of the objections raised so that information could be supplied to meet those needs on mutually satisfactory terms. The Union refused to state its needs in any greater detail as requested and filed an unfair labor charge with the Board.

A refusal to supply information relevant to the proper performance of a Union's collective bargaining role will support a Board finding of refusal to bargain in good faith under section 8(a) (5) of the Act. NLRB v. Acme Industrial Co., 1967, 385 U.S. 432, 435–436, 87 S.Ct. 565, 17 L.Ed.2d 495; NLRB v. Truitt Mfg. Co., 1956, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027. The first question in such a case is always one of relevance. If the information requested has no relevance to any legitimate union collective bargaining need, a refusal to furnish it could not be an unfair labor practice. In this case the Trial Examiner found, and the Board agreed, that each of the items subject to the Board's order satisfied the relevancy requirement. We assume, without deciding, that each of those findings is supported by substantial evidence on the record as a whole.

The Company argues, however, that even though the requested information be relevant, the Company's failure to

furnish it, taking into account all of the circumstances in which it was demanded, is not a refusal to bargain in good faith. We find this argument persuasive. The factual circumstances which we deem important are set out below:

*First:* the Company stated specific objections to furnishing each of the items requested. There is no suggestion that its reasons were disingenuous or merely a cover-up to delay or frustrate the Union's request. The Trial Examiner credited the Company's fear that disclosure of the guide curves would jeopardize its entire salary system.[1] The Trial Examiner also apparently agreed with the Company's objection to furnishing the Union with merit ratings because he ruled that the Union was not entitled to merit ratings for supervisory personnel. With respect to academic degree and type of work data, the Trial Examiner did not question the genuiness of the Company's concern for anonymity with respect to the salaries of its professional employees, but ruled only that the Company was not entitled to claim protection of Union members as a basis for withholding information from the Union. We do not purport to decide whether the objections raised by the Company would constitute an absolute defense to disclosure of each of the items requested.[2] Rather, we think that the legiti-

[1] While the Trial Examiner apparently believed the sincerity of the Company's apprehensions, he thought the Company's fears were logically unfounded. Before the Company constructs the guide curves it lumps all of the 6000 salaries received from the survey companies according to merit rating and then statistically smooths the curves. As a result the guide curves would not show what any individual company was paying. Nevertheless, the Company says that the survey is conducted with the understanding that neither the raw data nor the results of the data be revealed. The guide curves, says the Company, are results.

[2] A number of cases hold that confidentiality of information to the employer rather than to a third party is no defense to the production of relevant wage in-

formation. See, *e. g.,* NLRB v. Frontier Homes Corp. 8 Cir., 1967, 371 F.2d 974; Curtiss-Wright Corp., etc. v. NLRB, 3 Cir., 1965, 347 F.2d 61. Two recent decisions in the courts of appeals have upheld Board orders requiring production of area wage survey data. However, a confidentiality defense does not appear to have been raised in those cases. See General Electric Co. v. NLRB, 4 Cir., 1969, 414 F.2d 918; General Electric Co., Battery Prod., Cap. Dept., v. NLRB, 5 Cir., 1968, 400 F.2d 713. But see Mc-Culloch Corp., 1961, 132 N.L.R.B. 201 (holding that confidentiality of wage survey information is a defense to providing wage information linked to identified companies).

With regard to the anonymity defense, it has been held that an employer may not rely on employees' rights as a basis

macy of the Company's concern about the adverse effects of disclosure bears on the question whether the failure to furnish the information was a refusal to bargain in good faith.

*Second:* the Company did not flatly refuse to comply with the Union's request. After making clear its objections to each of the items requested, the Company offered to discuss the request in light of the Union's specific need for the information so that information could be supplied in a form which would at the same time satisfy the Union's requirements and overcome the Company's objections. This offer was consistent with the parties' past practice, and the Company has not been unresponsive to the Union's need for information. Nor is there any indication in the record that the Company's similar offer after the Union's January 30 request was not bona fide.

*Third:* the Union did not take up the Company's offer to provide the information in a mutually satisfactory form. Instead it insisted on its claimed right to receive the data in the precise form requested, stating only that it needed the information in order to bargain intelligently. As we have pointed out this was a departure from past bargaining practice. Furthermore, there is evidence in the record to suggest that had the Union taken a more flexible approach and stated its needs in greater detail agreement might have been reached to supply at least some of the information requested on mutually satisfactory terms. We do not think there would be the slightest basis for an unfair labor practice charge where the Company offers information in a form different from that demanded but which nonetheless meets every need stated by the Union. It would be somewhat anomalous to hold that the result changes and an unfair labor practice is shown where the Union's refusal to state its needs in

effect precludes the Company from making good on its offer to provide the information in a mutually satisfactory form.

The factual circumstances set out above and upon which we rely are similar to those that were before the Board in American Cyanimid Co., 1960, 129 N.L.R.B. 683. There the company had refused a union demand for unrestricted access to exact copies of job evaluation and description records for study outside the company plant. Conceding that the information was relevant and necessary to the union's collective bargaining role, the company nevertheless refused to provide it, stating that the records would reveal unique manufacturing techniques and processes the confidentiality of which was crucial to maintenance of its competitive position. The company explained its reasons to the union, but the union maintained that it had a right to the information in the form and manner requested. The Board's opinion, finding no refusal to bargain in good faith, is instructive:

"We agree with the Trial Examiner that the issue presented to us is a narrow one, i. e., whether the Respondent's refusal in the context of the Union's request for copies of its records for study and analysis outside the plant supported the alleged violation of Section 8(a) (5) and (1) of the Act. We find that it did not. This is so because the adamant insistence of the Union on its right to have the Respondent's records in the terms set forth in its demand precluded, in effect, a test of the Respondent's willingness to give the Union access to the wage information involved on mutually satisfactory terms. In these circumstances, and in light of the legitimate economic interest on which the Respondent's refusal of the Union's demand was premised and explained to the Union,

for withholding relevant information. See, e. g., NLRB v. Frontier Homes Corp., *supra*; Boston Herald-Traveler

Corp. v. NLRB, 1 Cir., 1955, 223 F.2d 58; NLRB v. Item Co., 5 Cir., 1955, 220 F.2d 956.

we do not find that the Respondent's conduct constituted a refusal to bargain within the meaning of the Act." 129 N.L.R.B. at 684.

Similarly, here, the Union adamantly insisted on its right to have the information in the precise form demanded. It refused to specify its needs or to meet with the Company and discuss an alternative form despite the Company's offer. Instead, the Union proceeded directly to the Board. We think that action was premature because, in the language of *American Cyanimid,* it "precluded, in effect, a test of the [Company's] willingness to give the Union access to the wage information involved on mutually satisfactory terms."

A recent Sixth Circuit decision, Kroger Co. v. NLRB, 6 Cir., 1968, 399 F.2d 455, approved of and relied on *American Cyanimid.* In *Kroger* the Board found an unfair labor practice in the Company's refusal to disclose its operating ratio program to the union. The Board had found the information relevant to the Union's collective bargaining role because of the significant relationship between the operating ratio program and working conditions. The court did not dispute this finding, but rather held that because the program covered many phases of Kroger's operation, only some of which were of legitimate concern to the Union, the Union had shown no need for disclosure of the total data, especially in light of the potential competitive damage to Kroger from total disclosure. "The critical problem," the court observed, "appears to be how to recognize and how adequately to protect each of the conflicting interests that are involved here." 399 F.2d at 457. The Board's order failed to reach such an accommodation, and the court denied enforcement.

We realize that the Board's order in *Kroger* was overbroad because it required disclosure "whether or not the information had any direct relationship to the union's collective bargaining interests." 399 F.2d at 457. That is

not so here; as we assumed at the outset, all of the information demanded is of legitimate concern to the Union. Nevertheless, *Kroger* provides a useful analogy. Like the Union's request in *Kroger,* the demand here is in a sense overbroad. The Union demanded information in a very precise form yet stated its need to the Company only in terms of general relevance to intelligent bargaining. As the Union's specific needs became clear during the course of the Board's hearing, it began to appear that some of those needs, if not all, might be satisfied by providing information in a more limited form. And, as was not the case in *Kroger,* the Company here offered to work with the Union to find a more limited yet mutually satisfactory form for disclosure. Thus we are faced with the same problem of accommodating competing interests that faced the *Kroger* court.

■ We hold that where, as here, the Company raises *bona fide* objections to the form in which information is requested and offers to provide information sufficient to meet the Union's needs in a mutually satisfactory form, the Union must do more than rely on general avowals of relevance in order to establish its right to the information. It must state the uses to which the information is to be put so that the Company is afforded an opportunity to provide it on mutually satisfactory terms. We do not mean to suggest that the collective bargaining process become bogged down in discussions involving a collateral matter such as the form in which information, essential to the Union's proper role on central bargaining issues, is to be provided. The Union need not engage in lengthy negotiations on this subject. We hold only that the Union must afford the Company an opportunity to comply by specifying its needs. Once the Union has done so, a Company failure to provide information adequate to meet the Union's needs within a reasonable time would support an unfair labor charge before the Board. It may well be that no form in which the infor-

mation could be put would both satisfy fully the Union's needs and overcome the Company's objections. If such is the case, and if the Company fails to provide the information, the Board is the proper forum for weighing the conflicting interests. But resort to the Board is premature where the company, in the first instance, has attempted to find a mutually satisfactory form for disclosure and the union has not followed the steps outlined above. Thus we express no opinion in this case as to whether or not, had the Union specified its needs, it would have been entitled to the precise information the Board's order requires. We hold only that an unfair labor practice charge is not supported where the Union has, without more, declined to state its needs, thus frustrating the Company's offer to provide the information in an alternate form. To hold otherwise would be to command the Company to bargain not merely in good faith, but in blind faith.

Nothing in this opinion should be construed to preclude the Board from finding an unfair labor practice where a company's objection to the form in which information is requested is frivolous, or based on a belief that the law does not require its production, or made for the purpose of delay or to frustrate contemporaneous negotiations.

The Board cites to us cases which it says stand for the proposition that once the relevance of the information is established, a refusal to furnish it is a per se violation of the Act.[3] See NLRB v. Woolworth Co., 1956, 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed.2d 235 rev'g per curiam, 9 Cir., 1956, 235 F.2d 319; Puerto Rico Telephone Co. v. NLRB, 1

Cir., 1966, 359 F.2d 983; Curtiss-Wright Corp., etc. v. NLRB, 3 Cir., 1965, 347 F.2d 61; Taylor Forge & Pipe Works v. NLRB, 7 Cir., 1956, 234 F.2d 227. We do not understand the Supreme Court to have enunciated such a *per se* rule. In NLRB v. Truitt Mfg. Co., *supra*, the Court admonished,

"Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." 351 U.S. at 153–154, 76 S.Ct. at 756.

While the cases cited by the Board do contain language broadly announcing a *per se* rule, a careful examination of the facts of those cases reveals that the holdings are considerably narrower. *Taylor Forge* holds merely that the employer's good faith though mistaken belief that it was not legally required to furnish the information requested is no defense. In *Curtiss-Wright* the employer argued that a refusal to supply relevant information is not alone sufficient to support a finding of refusal to bargain in good faith, but that there must also be a finding of "a bad faith refusal to actually sit down at the bargaining table to avoid meeting and conferring * * *." 347 F.2d at 68. The court wisely rejected the argument because "[m]erely meeting and conferring without a prior exchange of requested data, where such is relevant, does not facilitate *effective* collective bargaining." *Id.*, (emphasis in original.) *Puerto Rico Telephone* cites *Curtiss-Wright* as authority for a *per se* rule, but the remark appears to be merely gratuitous since the employer's

---

3. The Board itself has not always adhered to a strict *per se* rule. See, *e. g., McCulloch Corp., supra,* note 2; Westinghouse Electric Corp., 1960, 129 NLRB 850 (a refusal to supply information the compilation of which would be unduly burdensome or time consuming is not a refusal to bargain in good faith); *American Cyanimid Co., supra.*

A number of decisions in the Courts of Appeals have not applied a *per se*

rule in this area. See NLRB v. Twin City Lines, Inc., 8 Cir., 1970, 425 F.2d 164; Prudential Ins. Co. of America v. NLRB, 2 Cir., 1969, 412 F.2d 77; Kroger Co. v. NLRB, *supra*; Fafnir Bearing Co. v. NLRB, 2 Cir., 1966, 362 F.2d 716; NLRB v. Western Wirebound Box Co., 9 Cir., 1966, 356 F.2d 88; J. I. Case v. NLRB, 7 Cir., 1958, 253 F.2d 149.

only defense in *Puerto Rico* was to challenge the relevance of the information requested there. None of the above cases is controlling here. The Company does not rely on its good faith belief that the information is irrelevant or on its good faith performance of its duty to meet and confer. Rather the Company relies on its good faith offer to provide the information in a mutually satisfactory form. None of the cases cited by the Board holds that a union has a *per se* right to information *in the precise form demanded.*

In NLRB v. F. W. Woolworth Co., *supra,* this court held that a union's request for complete payroll information must be accompanied by some statement of specific relevance beyond a general justification of need to intelligently administer the agreement. The Supreme Court's opinion, reversing *per curiam* fails to illuminate its reasons. We think, however, that *Woolworth* is to be classed with those cases holding wage and related information presumptively relevant so that the union need not explain its specific needs unless effective employer rebuttal comes forth. See *e. g.,* Boston Herald-Traveler Corp. v. NLRB, 1 Cir., 1955, 223 F.2d 58; NLRB v. Item Co., 5 Cir., 1955, 220 F. 2d 956; NLRB v. Yawman & Erbe Mfg. Co., 2 Cir., 1951, 187 F.2d 947.

The reason for the rule of presumptive relevance is sound. It avoids potentially endless bickering between management and the union over the specific relevance of information, the very nature of which ought to render its relevance obvious. Our holding here is in no way inconsistent with the cases applying the rule of presumptive relevance. None of those cases involved a specific company objection to the form of the information requested coupled with an offer to provide it in a mutually satisfactory form. In this case there is a very good reason to require the Union to specify its needs in more detail—not to convince the Company of the relevance of the request but to afford the Company an opportunity to make good on its offer to supply the information in a different form.

 With regard to that portion of the Board's order requiring the Company to furnish the Union a written explanation of the salary guide curves, we think enforcement should be denied for a different reason. In June, 1965, the Company prepared a document explaining its salary system and gave it to the Union. Subsequently, on two occasions the Company presented oral explanations of the system. There is no substantial evidence in the record that either the written or oral explanations were in any way deficient. Even if they were deficient, neither the Board's order nor the Trial Examiner's decision gives any hint as to what the deficiencies are. The Board's order, in this respect, is so vague that the Company cannot reasonably be expected to know what is required of it.

For the reasons set out above the Board's order is denied enforcement and is set aside in its entirety.