Daniel Wayne FRONCZAK, Prisoner # 39169–115, El Reno Reformatory, El Reno, Oklahoma, Petitioner,

v.

WARDEN, EL RENO REFORMATORY, EL RENO, OKLAHOMA, and United States Board of Parole, Respondents.

No. CIV–76–0324–D.

United States District Court, W. D. Oklahoma.

June 21, 1976.

Philip B. Abramowitz, Robert C. Macek, Buffalo, N.Y., Michael A. Fisher, Chicago, Ill., for petitioner.

David Russell, U.S. Atty., by William S. Price, Asst. U.S. Atty., Oklahoma City, Okl., for respondents.

## ORDER

DAUGHERTY, District Judge.

This is a proceeding for a writ of habeas corpus by a federal prisoner confined at the Federal Reformatory, El Reno, Oklahoma, who claims that he is entitled to his immediate release or other appropriate habeas relief because his rights to meaningful parole consideration have allegedly been infringed. Pursuant to an Order of this court the respondents have filed their Response and submitted for the court's examination all documents and papers considered by the Hearing Examiners of the United States Board of Parole who heard and determined the petitioner's case together with the transcript of the proceedings and the record on appeal.

From the court's examination of the complete files and records herein it appears that on May 2, 1975, the petitioner was convicted of Conspiracy to Distribute Cocaine in the United States District Court for the Southern District of Indiana, South Bend Division upon his plea of guilty and on May 30, 1975, he was sentenced to an indeterminate sentence under the provisions of the Federal Youth Corrections Act, 18 U.S.C. § 5010(b). On the same date pursuant to this sentence the petitioner was committed to the custody of the Attorney General and thereafter on June 20, 1975, delivered to the Federal Reformatory at El Reno, Oklahoma.

He alleges that on or about August 1, 1975, he requested by written application to be released on parole. On October 29, 1975, the petitioner was notified that a hearing would be held during the week of November 17, 1975. Thereafter, on November 17, 1975, the petitioner together with his counsel met with two Hearing Examiners of the United States Board of Parole. On November 25, 1975, the petitioner was notified that the action taken by the Parole Board was to "continue with an Institutional Review Hearing January 1977." The reasons for this action were stated as follows:

"Your offense behavior has been rated as very high severity. You have a salient factor score of 10 (see attached sheet). You have been in custody a total of 5 months. Guidelines established by the Board for youth cases which consider the above factors indicate a range of 20–27 months to be served before release for cases with good institutional program performance and adjustment. After careful consideration of all relevant factors and information presented, it is found that a decision outside the guidelines at this consideration does not appear warranted."

The petitioner then sought review of the Board's decision at the Regional level and the previous decision of the Board was affirmed on December 19, 1975. He also perfected a National Appeal which again resulted in an affirmation of the original decision.

The petitioner first complains that the Notice of the hearing was inadequate because it did not inform him of the considerations that might be relied upon to deny him parole or what evidence might support those considerations.

28 C.F.R. § 2.18 explains that the granting of parole rests in the discretion of the Board of Parole. § 2.19 enumerates those factors generally considered by the Board, such as sentencing data, details of the present offense, personal and social history, prior record, rehabilitation performance and institutional adjustment. § 2.20 provides that to establish a national paroling policy the Board has adopted guidelines for parole consideration. It was unnecessary for the Board to include this information in the Notice of the hearing. It is not a denial of due process not to notify prospective parolees of the facts militating against parole. *Lewis v. Rockefeller*, 305 F.Supp. 258 (S.D.N.Y.1969), affmd., 431 F.2d 368 (CA2 1970).

The petitioner's next contention that he was denied a reasonable amount of time to present his case and that his counsel was denied an adequate opportunity to speak is completely refuted by the record. Despite being asked to limit his remarks to five minutes counsel spoke for over 20 minutes and the total hearing time was a little over 30 minutes. The petitioner had no constitutional right to counsel before the Board. *Buchanan v. Clark*, 446 F.2d 1379 (CA5 1971), cert. denied, 404 U.S. 979, 92 S.Ct. 347, 30 L.Ed.2d 294; *Menechino v. Oswald*, 480 F.2d 403 (CA2 1970), cert. denied, 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 685. The Board's regulations do permit the prisoner to have a representative present to offer a statement at the conclusion of the interview of the prisoner by the Examiner Panel and to provide any additional information the Panel may request. The conduct of the hearing was in accordance with this regulation. Counsel was given full opportunity to present anything to the Board which he considered appropriate and the Board did not unreasonably restrict his argument.

The petitioner claims that he was denied an adequate opportunity to view the materials and documents relied upon by the Hearing Examiner, and therefore to explain or refute the information contained therein. He assumes a right which he did not constitutionally possess. A prisoner has no absolute right to inspect the files of the Parole Board. *Ott v. Ciccone*, 326 F.Supp. 609 (W.D.Mo.1970). Nevertheless the Board, although perhaps not required to do so, had permitted the petitioner to examine at least some of the materials and documents contained in its files. The petitioner does not deny such access but instead asserts that it was not "adequate". The transcript reveals that the Hearing Examiner reviewed with the petitioner the details of his offense, the staff had previously discussed with the petitioner his "Salient Factor Score" and he agreed that 10 was his correct score. The Hearing Examiners also discussed with him the severity of the offense rating. Other answers of the petitioner indicate that he was familiar with the reports before the Board concerning his rehabilitation performance and institutional adjustment. He was permitted to disagree with or correct any of this information and as previously noted counsel was given great latitude in his statement to the Board.

Likewise the petitioner's allegations that he was denied the right to confront and cross-examine those furnishing evidence and information against him in violation of minimal due process standards is without merit. A prisoner does not have a constitutional right to cross-examine members of the Board or persons who may have provided information to the Board. *Tarlton v. Clark*, 441 F.2d 384 (CA5 1971), cert. denied, 403 U.S. 934, 91 S.Ct. 2263, 29 L.Ed.2d 713.

The petitioner makes a broad attack upon the sufficiency of the reasons given for the Board's action and the use of the guidelines in this case. It is now settled that a prisoner is entitled to a "brief statement" of the reasons for the action of the Board. *Mower v. Britton*, 504 F.2d 396

(CA10 1974). With an offense severity rating of "very high" and a salient factor score for offender characteristics of 10, the appropriate "guidelines for decision making" applicable to youths indicate 20 to 27 months should be served before release. 28 C.F.R. § 2.20. The petitioner was informed of this and it was pointed out that he had only been in custody five months. The set-off was at the very bottom of the guidelines. Although the regulations permit a severity rating different from that listed in the guidelines if there are especially mitigating or aggravating circumstances, the severity rating decision in petitioner's case in accordance with the guidelines was properly within the discretion of the Board. *Brown v. Lundgren,* 528 F.2d 1050 (CA5 1976).

■ The statement adequately advised the petitioner of the basis for the Board's action. There was not in petitioner's case the reliance upon the "boiler plate reason" that his release would depreciate the seriousness of the offense and thus be incompatible with the welfare of society condemned in *Lupo v. Norton,* 371 F.Supp. 156 (D.Conn. 1974); *Soloway v. Weger,* 389 F.Supp. 409 (M.D.Pa.1974); *Billiteri v. United States Board of Parole,* 385 F.Supp. 1217 (W.D.N. Y.1974); *Craft v. Attorney General of United States,* 379 F.Supp. 538 (M.D.Pa.1974); *Candarini v. Attorney General of United States,* 369 F.Supp. 1132 (E.D.N.Y.1974). Here the principal reliance by the Board upon the guidelines is manifest and the petitioner well knows the basis for the Board's action. The Administrative Procedure Act would seem to require no more. It mandates the statement of reasons. It does not necessitate that the prisoner agree or be satisfied with the reasons given. As pointed out in *Mower v. Britton,* supra, the courts do not purport to control discretion.

■ In the special situation of the youth offender, one court has imposed a further requirement that the reasons must relate to the adjustment and rehabilitation efforts made within the institution. *Snyder v. United States Board of Parole,* 383 F.Supp. 1153 (D.Colo.1974). Although finding the use of guidelines properly within the discretion afforded to the Board it would in effect require the Board to justify any decision to follow the guidelines in the cases of youthful offenders. Board policy now requires additional reasons be given when the decision is made outside the range indicated by the guidelines. 28 C.F.R. § 2.13(c). The result reached by the court seems unwarranted. If the adoption of the guidelines was not an arbitrary act, as recognized by the court, it seems inconsistent to demand that an explanation be given for their application in a particular case. Individualized treatment and consideration does not preclude an identical statement of reasons for all persons for whom, after such individualized consideration, treatment in accordance with the guidelines is best indicated. To require more specific reasons from the Board when the obvious and true reason is the reliance on the guidelines, realistically is to infringe upon the discretion of the Parole Board despite any disclaimers to the contrary. By inference the court has said that you cannot deny parole unless the prisoner's adjustment and rehabilitative efforts are unsatisfactory and that it is an abuse of discretion for the Board to make a decision based primarily on the guidelines. The guidelines are established specifically for the cases with good institutional adjustment and program progress, 28 C.F.R. § 2.20(b), as petitioner was advised in his statement of reasons. If the petitioner's adjustment and program progress had not been satisfactory his continuance would have been above the time ranges contained in the guidelines. Due process and the Administrative Procedure Act are satisfied with a meaningful and understandable statement of reasons for the action. The Youth Corrections Act should not be read as engrafting an additional requirement of an evaluative statement of the prisoner's rehabilitation efforts. In petitioner's case such a statement would not have enhanced his understanding of the action taken as the Board had already indicated that his institutional adjustment and program progress was good. It is the function of the Parole Board to determine if the

prisoner is ready for release and not to devise a program of treatment and establish institutional goals. That role is properly the task of other personnel within the Bureau of Prisons.

In *United States ex rel. Mayet v. Sigler*, 403 F.Supp. 1243 (M.D.Pa.1975) the court concluded that the use of guidelines in decision making for youth offenders was improper:

"Such guidelines, which utilize an analysis of the prisoner's offense as a critical factor in determining how long he will be incarcerated, violate the purpose of the Youth Corrections Act. The Board of Parole has a duty to consider prisoners sentenced under its provisions for parole at any time. The history of the Act shows that the prisoner's response to so-called treatment and his supposed rehabilitation are the primary considerations to be used in determining when a Youth Offender should be released on parole. 1950 U.S. Code Congressional Service, page 3985.

In a recent discussion of the Youth Corrections Act, the United States Supreme Court in *Dorszynski v. United States,* 418 U.S. 424, 434, 94 S.Ct. 3042, 3048, 41 L.Ed.2d 855 (1974), stated, 'An important element of the program was that once a person was committed for treatment under the Act, *the execution of sentence was to fit the person, not the crime for which he was convicted.*' (Emphasis added). Although the holding in Dorszynski was limited to a pronouncement that District Judges must find that youth offenders will not benefit from treatment under the Youth Corrections Act before they may be given regular adult sentences, the quoted language nevertheless supports the historical analysis of the Act which places great stress on treatment and rehabilitation. Thus, the guidelines, which take offense severity into account as a critical factor in determining how long a Youth Offender will be incarcerated, violate the purposes of the act and are illegal." 403 F.Supp. at 1244.

■ This court does not agree that the Board has exceeded its statutory authority in utilizing the guidelines in making parole decisions for youth offenders. In exercising its discretion the Board takes into consideration many factors. See 28 C.F.R. § 2.19. The guidelines were adopted:

". . . To promote a more consistent exercise of discretion and enable fairer and more equitable decision making *without removing individual case consideration.*"

Guidelines consist of separate tables for adult offenders and youth offenders. Each table is constructed to indicate approximate ranges of time to be served for various combinations of two factors: (1) severity of the offense and (2) characteristics of the offender. Offenses are grouped in six rows of categories from "low" to "greatest" severity. Offender characteristics (salient factor score) are grouped in four categories from "poor" to "very good" probability of favorable parole performance. At the intersection of each variable there appear in the tables in multi-month ranges, different time periods of confinement that provide a guideline for the decision maker considering a prisoner with particular offense severity and offender characteristics. It is explicitly stated:

"These time ranges are merely guidelines. Where the circumstances warrant, decisions outside of the guidelines (either above or below) may be rendered. For example, cases with exceptionally good institutional program achievement may be considered for earlier release." 28 C.F.R. § 2.20(c).

Obviously, use of the tables does not preclude individualized consideration of each youth offender's case. It, in fact, makes it absolutely necessary since before the tables can be applied to a particular offender his individual characteristics must be determined in order to locate the appropriate category of offender characteristics. The guidelines do not restrict discretion but simply provide a rational basis founded upon prior research and experience for its exercise with respect to the particular offender.

To deny the Board the right to consider the offense severity would severely restrict its discretion.

To limit the Board to a consideration of institutional adjustment and rehabilitation programs not only is not justified by any reading of the Youth Corrections Act it would appear directly to interfere with the objective of a sentence designed "to fit the person". 18 U.S.C. § 5006(g) states:

> " 'Treatment' means corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders."

It seems totally naive to conclude that a Board could evaluate a person and provide an effective program of treatment without any consideration of what he has done in the past. Rehabilitation is plainly the goal of the Youth Corrections Act. Rehabilitation, however, relates to an individual. That individual is a person who has committed a murder, robbery, car theft or some other offense of greater or lesser seriousness. That very act says something about the "antisocial tendencies" of the offender which treatment must be designed to correct. Any rehabilitation program which ignores that fact must be inadequate to serve either the interest of the public or the offender. The ultimate purpose of the Act is "to protect the public". The means selected by Congress to accomplish this purpose is "by correcting the antisocial tendencies of youth offenders". The judgment of when the means have been successful and it is safe to return the individual to society was properly left to the expertise of the Youth Corrections Division of the Parole Board.

It is often reiterated, but increasingly disregarded in practice, that members of the Parole Board are experts in the field of corrections and the courts are not. It is a dangerous intrusion into the field of corrections for a court to disarm the experts of a valuable predictive device developed in the crucible of experience. Certainly this court cannot conclude that its use is arbitrary and has no rational basis or relation to the object of protecting the public and the reha-bilitation goal of correcting the offender's "antisocial tendencies", particularly, when it is administered with the flexibility contemplated by the regulations. When the time comes to make a decision for or against release the prognosis of a successful entry into society is all-important. Congress surely did not intend that it be a guessing game, divorced from reality. Prediction of human behavior is at best an inexact science in which the decision-maker needs all the guidance he can muster. All relevant factors should be available to the Board for the exercise of its discretion and the court should not judicially excise the use of relevant information or helpful techniques. Viewed as a tool and not a rule the guidelines do not have the effect of altering the sentences of the youth offender into determinate sentences and they do not violate the spirit, purpose and legislative intent of the Youth Corrections Act.

The petitioner finally claims:

"The failure of respondent, Board of Parole to grant petitioner the opportunity to appear, in person or by counsel or other representative, before the decision making body on the Regional and National Appeals, violates minimal due process standards and 28 C.F.R. § 2.25."

28 C.F.R. § 2.25 provides:

> "Regional appellate hearings shall be conducted at the Regional Office before the Regional Directors. Attorneys, relatives, and other interested parties who wish to appear must submit a written request to the Regional Director stating the relationship to the prisoner, the general nature of the information they wish to present. The Regional Director shall determine if the requested appearances will be permitted. The prisoner shall not appear personally."

The petitioner does not allege that a request for appearance by counsel was made to either of the appeals boards. The file does not contain such a request. Counsel prepared a five page letter dated December 16, 1975, in connection with appeal but made no mention therein of any desire to be heard in person on the appeal. The regula-

tion prohibiting representation by counsel at a parole hearing is not unconstitutional. *Schawartzberg v. United States Board of Parole,* 399 F.2d 297 (CA10 1968). A fortiori a regulation granting a limited right for appearance of counsel in appeals from parole decisions conditioned upon a prior request to, and permission by, the Regional Director is not unconstitutional. The petitioner cannot complain when he did not even comply with the regulations.

Counsel for the petitioner acknowledged in his appearance before the Examiner Panel that parole consideration is not an adversary proceeding. He was correct in that conclusion and he is wrong in his contention that petitioner was entitled to all the procedural due process rights asserted in the Petition. The prisoner may be entitled to "modicum of due process" in a hearing to consider his release on parole. See *Mower v. Britton,* supra. Such due process, however, does not embrace the full panoply of rights due a parolee in a parole revocation hearing and:

". . . he is not entitled to an opportunity to present witnesses and documentary evidence in support of his release on parole. Nor is an inmate entitled to confront and cross-examine persons who have provided the Board with adverse information, or to interrogate the Board members. A prisoner does not have a constitutional right to examine his record or Parole Board files, and he is not entitled to rebut information in possession of the Board which militates against his parole. The foregoing rights are the kind usually associated with an adversary-type hearing or adjudicatory proceedings in which vital issues of fact are to be decided which affect important rights of the litigants. The Board does not function as an adversary of the prisoner, and it has an interest in releasing those who qualify for parole. *Menechino v. Oswald,* 2 Cir. 1970, 430 F.2d 403, 407–408, cert. denied, 1971, 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635; *Scarpa v. United States Board of Parole,* [5th Cir., 1973, 477 F.2d 278, vac., 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44] supra. The above pro-

cedural due process rights would convert the inmate's interview before the Parole Board into an adversary hearing, thereby unnecessarily hindering and burdening the parole decision-making process." *Wiley v. United States,* 380 F.Supp. 1194, 1200 (M.D.Pa.1974).

In *Brown v. Lundgren,* supra at 1052 the court stated:

"At the constitutional level, there is a clear distinction between the loss of a statutory privilege once obtained and the denial of that same privilege, never given. While the threatened loss of a privilege may be 'grievous' and therefore require some degree of procedural due process protection, see, e. g., *Morrissey v. Brewer,* 1972, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484, the denial of that privilege may only be subject to the procedural demands of the particular enabling statute. Thus, while parole revocation and prison discipline are clearly within the ambit of the Due Process Clause of the Fifth and Fourteenth Amendments, the mere expectation of parole release while still in otherwise lawful custody is not so vested as to result in a 'grievous loss' if denied by the parole board. We thus disagree with the characterization by the Court of Appeals for the District of Columbia of the denial of parole as a deprivation of 'the valuable features of conditional liberty' equivalent to the loss involved in parole revocation that mandates due process protection. *Childs v. United States Board of Parole,* 1974, 167 U.S.App.D.C. 268, 511 F.2d 1270, 1278.

In any context where it is asserted that constitutional due process is required, the basic, threshold question is whether there is a 'grievous loss' of either a liberty or property interest. If there is not such loss, then the second question of whether the particular challenged procedure comports with fundamental fairness is never reached. In short, we find that the denial of parole as distinguished from the revocation of parole as in *Morrissey,* supra, is not a 'grievous loss', and we therefore do not consider whether the proce-

dures of the parole board deny constitutional due process."

The petitioner is not entitled to relief. He has stated no denial of a federal constitutional right which requires his immediate release from custody. The record rebuts any claim that the action of the Board was arbitrary or capricious and affirmatively shows that its decision was within the broad discretion vested in the Board and that the Board did not violate its own regulations. The lawful denial of a parole does not impinge upon any constitutional right. *Carson v. Executive Director, Department of Parole*, 292 F.2d 468 (CA10 1961). This court cannot serve as a super Parole Board. *Wiley v. United States Board of Parole*, supra.

Accordingly, the Petition for Writ of Habeas Corpus will be denied.

IT IS SO ORDERED.