SAN DIEGO NEWSPAPER GUILD, LOCAL NO. 95 OF the NEWSPAPER GUILD, AFL-CIO, CLC, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Union-Tribune Publishing Co., Intervenor.

No. 75-3584.

United States Court of Appeals, Ninth Circuit.

Feb. 22, 1977.

Richard D. Prochazka, argued, Donmitz, Prochaska & Mazirow, San Diego, Cal., for petitioner.

Vivian A. Miller, argued, Elliott Moore, Washington, D. C., for N. L. R. B.

James K. Smith, argued, Gray, Cary, Ames & Frye, San Diego, Cal., for intervenor.

Before BARNES and ELY, Circuit Judges, and KELLEHER, District Judge.*

OPINION

BARNES, Senior Circuit Judge:

The Decision and Order of the Board here challenged is reported at 220 N.L.R.B. No. 195 (1975).

Union Tribune Publishing Co. ("the Company"), an intervenor herein, publishes two

---

* The Honorable Robert J. Kelleher, District Judge, Central District of California, sitting by designation.

newspapers. It has collective bargaining agreements with six different organizations, one of which is the San Diego Newspaper Guild, Local No. 95 of the Newspaper Guild, AFL–CIO, CLC ("the Union"). The Union represents a bargaining unit of approximately 800 of the Company's employees, including those in its "outside circulation" department [1]—district managers, relief district managers,[2] newsstand men and circulation clerks.[3] District managers recruit carriers in their districts, coordinate payment collections and maintain lists of subscribers, carriers and drop locations.

Since 1965, the Company has utilized what it calls "Operation Survival" during contract negotiations with the unions, and on one occasion, during a dispute with one of the unions in 1972. In order to enable the Company to continue publishing and distributing its newspapers in the event of a strike, the Company activates the plan which calls for the training and orienting of individuals to take over all phases of the work customarily performed by its employees. This shadow labor force does not actually perform such work but is prepared to do so if a strike occurs. As there have been no work stoppages since 1965, Operation Survival has never been called into full operation.

The plan was put into effect during contract negotiations in 1965, 1967, 1970 and 1973. The last institution of the plan continued up to the time of the unfair labor practice hearing herein. The Company did not conceal the existence of the plan. During the 1965 negotiations, Operation Survival was discussed and the Union demanded that the Company furnish the identity and compensation of the persons who were being trained to perform the work of the district managers in the event of a strike.

The Company refused and the Union did not press the issue. In the 1967 and 1970 negotiations, the plan was only tangentially mentioned. When notified in 1972 that "Operation Survival" was being activated, the Union raised no objections. The 1973 contract talks did not consider the plan. Between 1965 and 1974 the Union filed no grievance or unfair labor practice charge concerning any aspect of Operation Survival.

As to the effect on the outside circulation department when Operation Survival is initially activated, supervisors of the circulation department train independent contractors and individuals, who have no other relationship with the Company, to take over the duties of the district managers and the relief district managers. "Survival personnel" are instructed as to the geography of the district assigned, the location of newspaper delivery or assembly points for carriers, and the basic paper work. Although the trainees are given duplicates of the district managers' route slips, they do not contact subscribers or carriers, do not distribute newspapers to a district, nor perform "any productive work that is now done or has been done by district managers or their reliefs." In the readiness phase of the plan, supervisors receive no extra compensation, although the survival personnel are compensated for their time and mileage travelled.

In March 1974, the Union became aware that district managers were being followed on their routes by individuals who represented that they were training to be strike replacements. On April 1, 1974, John C. Edgington, the Union's Executive Secretary, wrote to Oliver B. Peter, the Company's Director of Industrial Relations, requesting certain information about the indi-

---

1. The Company has divided its circulation area into 113 districts. 83 of those districts are assigned to district managers and the remaining 30 are serviced by independent contractors of which there are approximately 27 in number.

2. The ordinary progression is from relief district manager to district manager but occasionally district managers are hired from the circulation department at large. Those employees who are being trained to become district or relief district managers are treated as employees of the unit at the time of their training and are represented by the Union.

3. The Union does not represent independent contractors or the carriers who deliver to the subscribers.

viduals who were being trained to perform district manager and relief district manager duties. Article XXIV of the collective bargaining agreement provided inter alia:

"The Publisher shall furnish to the Guild in writing, the name, address, telephone number, sex, date of birth, Social Security number, date on payroll, contract classification, experience rating, experience anniversary date, and salary of each new covered employee within one (1) week after he or she has started to work and has been placed on the company payroll." (Emphasis added.)

In a reply letter, Peter responded that the Company was current in supplying information as to all new employees. Further correspondence and meetings between the Union and the Company did not produce any settlement of the issue. The Company maintained that it was under no obligation to give the information as the individuals were not doing any bargaining unit work. The Union insisted that it needed the requested information to determine if possible violations of the contract or encroachment in its jurisdiction had occurred.[4]

On June 3, 1974, the Union filed an unfair labor practice charge with the National Labor Relations Board ("the Board") alleging that the Company's refusal to provide the Union with the information constituted a violation of the employer's duty to bargain under Sections 8(a)(1) and (5) of the National Labor Relations Act ("the Act"). After a hearing on the matter, the administrative law judge dismissed the complaint in its entirety. While he found the trainees under the plan to be employees rather than

independent contractors as urged by the Company, the administrative law judge held that survival personnel did not function so as to be included in the bargaining unit. Further, he concluded that, as the trainees did not "presently perform" or affect the work covered by the collective bargaining agreement, the Union did not need the requested information to perform its duties under the contract. The Board affirmed the findings and conclusions of the administrative law judge and adopted his dismissal of the case in its entirety. The Union petitions this court for review of the Board's decision and order.

The only issue presented here is whether the Board erred in finding that the Company had not violated Section 8(a)(1) and (5) of the Act by refusing to provide the Union with certain information about those of its employees being trained to replace district and relief district managers in the sole event of a strike.

 It has long been held that there is a duty on the part of the employer to supply the union, upon request, with sufficient information to enable the latter to understand and intelligently discuss the issues raised in bargaining permitted by the collective bargaining contract. *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435–436, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *Standard Oil Co. of Calif. v. NLRB*, 399 F.2d 639, 642 (9th Cir. 1968). This duty is based upon the belief that without such information the union would be unable to properly perform its duties specified in the collective bargaining agreement and no meaningful

---

4. Article 1, paragraph 3 of the collective bargaining agreement provides that:

"The Guild has, and shall retain, jurisdiction over the kind of work presently performed by employees of the Publisher in departments and classifications covered by this contract. . . . It is further agreed that work being performed by independent contractors, by employees in other bargaining units and by employees not included in any bargaining unit shall continue to be performed by such persons. Nothing in the foregoing shall be construed to alter the Publisher's present practice or method of operation."

The Union asserted that it needed the information to determine if bargaining unit work was being performed by the survival personnel. Alternatively, it argued that if the survival personnel who were trained as district managers or relief district managers subsequently were hired to fill those positions in the course of normal vacancies, then those individuals were "doing" bargaining unit work as the Union had in the past represented employees during the period in which they were trained to be district and relief district managers.

bargaining could take place.[5] Morris (ed.), *The Developing Labor Law* 309–310 (1971). However, as this court noted in *Emeryville Research Center, Shell Dev. Co. v. NLRB*, 441 F.2d 880, 883 (9th Cir. 1971): "The first question in such a case is always one of relevance. If the information requested has no relevance to any legitimate union collective bargaining need, a refusal to furnish it could not be an unfair labor practice." *Accord, NLRB v. Pearl Bookbinding Co., Inc.*, 517 F.2d 1108, 1113 (1st Cir. 1975); *United Aircraft Corp. v. NLRB*, 434 F.2d 1198, 1204–05 (2d Cir. 1970), *cert. denied*, 401 U.S. 993, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971).[6] The existence of a duty thus depends on the factual circumstances of each particular case. *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 153–154, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); *Shell Oil Co. v. NLRB*, 457 F.2d 615, 618 (9th Cir. 1972). While the Board and the courts have employed a liberal definition of what constitutes relevant information,[7] the Board's determination as to whether the requested information is relevant in a particular case is given great weight by the courts either because it is a finding of fact, which is conclusive if supported by substantial evidence,[8] or because it is a finding on a mixed question of law and fact which is within the particular expertise of the Board. *Cf., International U., United Auto., A. & A. I. Wkrs. v. NLRB*, 147 U.S.App.D.C. 284, 455 F.2d 1357, 1364–

65 (1971); *Fafnir Bearing Co. v. NLRB*, 362 F.2d 716, 721 (2d Cir. 1966).

When the Union requests information and the employer refuses, there arises the issue of who has the initial burden of proof as to the relevance of the information. The courts have held that certain types of information, such as wage date pertaining to employees in the unit, are so intrinsic to the core of the employer-employee relationship that such information is considered presumptively relevant. *Emeryville Research, supra*, 441 F.2d at 887 (9th Cir.); *Curtiss-Wright Corp. v. NLRB*, 347 F.2d 61, 69 (3rd Cir. 1965). In those cases, the employer has the burden to prove a lack of relevance, *Prudential Insurance Co. v. NLRB*, 412 F.2d 77, 84 (2d Cir.), *cert. denied*, 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969), or to provide adequate reasons as to why he cannot, in good faith, supply such information, *cf., Shell Oil Co., supra*, 457 F.2d at 618–619 (9th Cir.). Conversely, when the Union requests information which is not ordinarily pertinent to its performance as a bargaining representative, but which is alleged to have become so because of peculiar circumstances, the courts have required a showing of relevance by the Union before holding that the employer must comply with the request. *Prudential Insurance, supra*, 412 F.2d at 84. Where the request is for information con-

---

**5.** As the duty to bargain extends beyond the period of contract negotiations and applies to labor management relations during the term of the agreement, *Acme Industrial, supra*, 385 U.S. at 436, 87 S.Ct. 565, the duty to furnish relevant information to the Union, upon its request, likewise continues during the term of agreement. *Cf. NLRB v. Goodyear Aerospace Corp.*, 497 F.2d 747, 751 (6th Cir. 1974).

**6.** The recent case of *Torrington Company v. NLRB*, 545 F.2d 840 (2d Cir. 1976); is not controlling. The collective bargaining agreement there contained "a provision, Article XV, Section 15.2 which gives the employees certain rights" (*id.* at 841), and both the Board and the Court concluded that "although some of the information sought related to employees whom the Union did not represent, the Union did show that *the information was relevant* to [the] enforcement of the contract by virtue of Section 15.2."

**7.** It has been held that the information only need be directly related to the union's function as a bargaining representative and that it appear reasonably necessary for the performance of that function. *See General Electric Co. v. NLRB*, 466 F.2d 1177, 1183 (6th Cir. 1972); *P. R. Mallory & Co. v. NLRB*, 411 F.2d 948, 955 (7th Cir. 1969). The Supreme Court in *Acme Industrial, supra*, 385 U.S. at 437, 87 S.Ct. at 569, noted that the issue should be determined under a "discovery-type standard" where the courts "of necessity must follow a more liberal standard as to relevancy."

**8.** Section 10(e) of the Act states in part: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."

cerning employees outside of the bargaining unit, *the Union must show that the requested information is relevant to bargainable issues. NLRB v. Rockwell-Standard Corp.,* 410 F.2d 953, 957 (6th Cir. 1969); *International Telephone and Telegraph Corp. v. NLRB,* 382 F.2d 366, 371 (3rd Cir. 1967), *cert. denied,* 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968); *Curtiss-Wright, supra,* 347 F.2d at 69.

■■ In the present case, while the administrative law judge found the survival personnel to be employees, he also held that they were not within the bargaining unit represented by the Union. That determination is not challenged by the Union on appeal. Consequently, information concerning those individuals is not presumptively relevant as Operation Survival and its non-unit participants are not subjects of mandatory bargaining by the Company.[9] Nevertheless, the Union correctly contended that it is entitled to the requested information if that information is necessary for it to fulfill its statutory duties as an exclusive bargaining agent. *Acme Industrial, supra,* 385 U.S. at 435–436, 87 S.Ct. 565; *C–B Buick, Inc. v. NLRB,* 506 F.2d 1086, 1093 (3rd Cir. 1974). Thus, it was incumbent upon the Union to make such a showing of relevance and need herein. *Prudential Insurance Co., supra,* 412 F.2d at 84.

■ As survival personnel are non-bargaining unit employees, and as there was no evidence of contract negotiation being carried on with the Union at the time of its request,[10] the information could only be relevant to the Union for purposes of determining if the Company had violated the collective bargaining agreement. Indeed, the Union's claims of relevancy and need are solely based on its desire to determine if the Company is permitting survival personnel to do bargaining unit work, either directly or through a scheme whereby certain of the participants avoid the training period normally required for district and relief district managers, during which period they would have been bargaining unit employees.

However, the Board found that the Union did not meet its burden in that the Union only demonstrated an abstract, potential relevance of the information to its allegations and failed to show that the information was actually relevant to the situation as it then existed.

■ As to the Board's initial contention, the issue is whether the Union must offer more than mere "suspicion or surmise" for it to be entitled to the information. It would seem reasonable that a greater showing is required. When union asks for information which is not presumptively relevant, the showing by the union must be more than a mere concoction of some general theory which explains how the information would be useful to the union in determining if the employer has committed some unknown contract violation. To hold otherwise would be to give the union unlimited access to any and all data which the employer has. Conversely, however, to require an initial, burdensome showing by the union before it can gain access to information which is necessary for it to determine if a violation has occurred defeats the very pur-

**9.** As noted in the Board's Brief, the employer need not bargain over its decision to use strike replacements and other defensive economic weapons. *M. R. & R. Trucking Co. v. NLRB,* 434 F.2d 689, 696 (5th Cir. 1970); *Hawaii Meat Company v. NLRB,* 321 F.2d 397, 400–401 (9th Cir. 1963); *cf., NLRB v. Insurance Agents' Union,* 361 U.S. 477, 488–498, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). The Board's finding that Operation Survival and its participants were part of the Company's defensive arsenal is supported by the record herein considered in total.

In addition, as was noted above, information concerning non-bargaining unit employees has been held by the courts not to be presumptively relevant. *See e. g., Rockwell-Standard Corp., supra,* 410 F.2d at 957.

**10.** The then-current collective bargaining agreement was effective from June 4, 1973 to June 6, 1976. The Union made its request on April, 1974.

However, it is noted that during this 1973–74 period, the Company was engaged in lengthy collective bargaining with another one of its six unions. Consequently, the revival of Operation Survival at that time was entirely consistent with the practice which the Company had followed in the past.

pose of the "liberal discovery standard" of relevance which is to be used. Balancing these two conflicting propositions, the solution is to require some initial, but not overwhelming, demonstration by the union that some violation is or has been taking place. As stated above, great weight should be given the Board's determination on this issue as the Board has access to all the evidence, the determination is within its particular expertise, and the question there is one of fact. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Millmen & Cabinet Makers Union,* 367 F.2d 953, 956 (9th Cir. 1966).

Here, the Board held that the Union failed to make *any* initial showing that the Company had violated the labor contract with its Operation Survival. That finding is supported by the record as a whole. The Union admitted that it: (1) had been made aware of all newly-hired personnel in the bargaining unit; (2) failed to offer any evidence of an actual instance when any of the bargaining units' work was performed by survival personnel; (3) did not cite any deviation from the Company's regular training of unit employees which might indicate that Operation Survival was being used as an unauthorized training vehicle;[11] (4) failed to contradict testimony of Compa-

ny's witness as to the operation of the plan and its non-impact on bargaining unit work; and (5) failed to show that it ever took any steps, apart from asking for the information from the employer, to determine if a violation had occurred. Consequently, the Union's claim of relevance and need fails as it is apparently grounded only upon the Union's suspicion that some contract violation is or has been taking place. That suspicion has been shown by the record before the Board to be totally unfounded.

The decision of the Board herein was that the Union failed to demonstrate the relevance of the information it requested from the Company. That conclusion is reasonable and is supported by substantial evidence in the record, and we will not disturb it.[12] Consequently, the decision and order of the Board is affirmed, and the petition for review is denied.

**11.** The Union makes two arguments as to the relevance of the requested information to ascertain if the training of survival personnel had an impact on bargaining unit work. First, it is asserted that the training given survival personnel is similar to that given to regular employees and hence, as regular trainees are included in the bargaining unit, survival personnel must also be included. However, the administrative law judge correctly distinguished between the two types of training. He noted initially that according to the uncontradicted testimony of the Company's witness the training of survival personnel, while consisting of instruction on bargaining unit work, did not include any actual performance of such work. Likewise, he found that the basic purposes of the two training programs were inapposite to each other.

The Union's second argument was that the Company was using Operation Survival as a means of avoiding the regular training period for certain of the participants in the plan. Apart from the lack of any evidence to support

such claim, the information which the Union requested would not have helped the Union to discover the validity of its allegation. The Union asked for information as to individuals *presently* being trained. Such data would not have aided in the determination of past violations of the training program by the Company. Further, the Union's concern over this issue could have been answered by determining if each new employee had gone through the regular training program rather than if he had ever been in Operation Survival. The latter fact would only become relevant after finding out about the former. Indeed, the Company did provide the Union with each new employee's "experience rating" and "experience anniversary date." Such information should have been sufficient for the Union to adequately verify if the Company was attempting to avoid the regular training program. The Union failed to show that it ever asked any new employee if he had gone through the regular training program.

**12.** *Standard Oil of Calif. v. NLRB,* 399 F.2d 639, 641 (9th Cir. 1968).