**SONOCO PRODUCTS COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 25217.

United States Court of Appeals, Ninth Circuit.

June 2, 1971.

E. Judge Elderkin (argued), William R. Irwin, of Brobeck, Phleger & Harrison, San Francisco, Cal., for appellant.

Leonard M. Wagman (argued), for NLRB, Arnold Ordman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., Roy O. Hoffman, Reg. Director, of NLRB; Gladstein, Anderson, Leonard & Sibbett, Brundage, Neyhart, Grodin & Beeson, San Francisco, Cal., for appellee.

Before CHAMBERS and BARNES, Circuit Judges, and THOMPSON, District Judge.*

BARNES, Circuit Judge:

Petitioner herein ("Sonoco" or "Company"), filed this petition to review a supplemental order of the National La-

* The Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation.

bor Relations Board (NLRB) finding Sonoco guilty of a refusal to bargain with certain persons. The NLRB has filed a cross-application for enforcement.

This case has been before us before. (Sonoco Products Company v. NLRB, 399 F.2d 835 (9th Cir. 1968)). At that time we set aside the order of the Board (165 NLRB 619, 1967) and remanded the action for an evidentiary hearing and reconsideration of certain issues. After a hearing, the Board issued a Supplemental Decision and Order (179 NLRB No. 101), finding the Company had violated Section 8(a) (5) and (1) of the Act by refusing to bargain with the two unions certified.

On the first appeal, the Company urged the original bargaining order should be set aside:

(a) because the Regional Director erred in setting aside the first (or 3/23/66) election, *favorable to the Company*, by a 17 to 14 vote;

(b) because the Regional Director erred in refusing to grant a hearing with respect to the Company challenges to the second (or 8/17/66) election, *favorable to the Unions*, by a 16 to 14 vote (one vote challenged).

This court previously rejected the Company's first contention, but found merit in the second.[1] We thereupon denied enforcement of the Board's original order, set it aside, and remanded the matter to the Board for further proceedings.

In doing so, this Court ruled, as the law of the case, that the Company was entitled to a hearing, at the representation stage as to the validity of the second election. We quoted the Board's regulations which provided that when "substantial and material factual issues exist which can be resolved only after a

hearing", the decision as to whether such a hearing should be had is not (as we said in our opinion) "an unfettered administrative discretion." (p. 839)

Against that standard, we considered:

(1) the Mendonca threats (pp. 840, 842);

(2) the telephone call to Scroggins (p. 842);

(3) the Gonzales incident (p. 843).

We then held:

(1a) The Regional Director erred in not considering the Mendonca threats, made at the time of the first election, with respect to their effect on the second election.

Standing alone, we stated, "those asserted threats would be enough to justify invalidation of the second election" (p. 841), if found to be true;

(2a) Petitioner's evidence as to Scroggins raised "a substantial and material factual issue";

(3a) That Gonzales' conduct alone, viewed in the light of the Mendonca threats and the telephone call to Scroggins, *might* (although unlikely), be sufficient to tip the balance "and require a new election."

Pursuant to our remand, the Board required the Regional Director to conduct a hearing before a Trial Examiner. He found that although the threats of bodily harm had in fact been made by Union representatives to Mendonca, these threats were without any possible effect on the second election. This despite the express language of our previous opinion, "that the asserted threats, if proved, would be enough to justify invalidation of the second election", and that undeniably, if found true, "they might well have been interference with Mendonca's free choice in the second election.[2]

---

1. As we noted in our previous opinion, a shift of one union member's vote would have changed the result of the second election. (Idem, p. 842).

2. We note with interest that although the Board pays scant or no attention to this quoted language in this Court's opin-

ion, to which it is opposed, it carefully points out in its brief (Brief, p. 26, n. 15) that our decision conceded it was "unlikely" that Gonzales' conduct, *alone*, "would justify overturning the second election"—language favorable to its position.

Accepting the fact "that the Teamsters' Local representatives indeed threatened Mendonca with harm, underscoring these threats with obscene epithets," the Trial Examiner nevertheless held "it was as reasonable to assume that the incident would have served to alienate the employees [hearing about the threats] from union affiliation as that it would instill them with fear of reprisals if they failed to support the Unions" (C.T. 197).

This reasoning simply assumes threats of bodily harm from one side to a union dispute can have only a neutral effect on the person receiving, hearing, or hearing of, those threats. We think such reasoning is legally unsupportable, and directly opposed to Mendonca's own testimony as to the effect of the threats upon him (C.T. 61–63 and 196).

Next the Trial Examiner says in effect that Mendonca provoked the threats by the signs he had exhibited near his car. These signs were expressions of his opinion, and a part of every employee's right to free speech. This seems to be too basic a position to require argument, or the citation of authorities.

The threats were real, and cannot be downgraded to be meaningless; or excused because thought to have been provoked by the exercise of free speech; or conclusively made of no evidentiary value by reason of a subsequent phone call. Cf. Poinsett Lumber & Manufacturing Co., 116 NLRB 1732, 1736–37; Intercontinental Mfg. Co., Inc., 167 NLRB 105.

We see no legal or moral justification for the creation by the Board of a double standard to be followed in determining what conduct on the part of union representatives, involving specific threats of *bodily harm* to those employees opposing the union, as compared to the conduct of employers, involving threats of *bodily harm* made by employers to those favoring a union.

■ The test employed to determine the necessity of setting aside a representation election is whether the employees have been prevented from freely registering their choice of a bargaining representative. Obviously the application of any standard, whether to employer or union conduct, should be even-handed. In this regard, the Board has consistently held that *employer* actions, such as photographing employees engaged in pro-union activity (Calmes Engineering Co., 1950, 90 NLRB 771), surveilling a union hall prior to an election (Franchester Corp., 1954, 110 NLRB 1391), interrogating employees concerning their union sympathies (Noll Motors, Inc., 1968, 168 NLRB No. 137), and threatening loss of economic benefits (Lenkurt Elec. Co., 169 NLRB No. 127), are sufficient to create an atmosphere inhibiting the free choice of a representative. Indeed, in Intercontinental Mfg. Co., Inc., 167 NLRB No. 105, the Board found that statements made by the employer's Secretary to the effect that he considered employees who wore union insignias to be his enemies, constituted a "threat" which inhibited free choice in the election and required the election to be set aside.

In like manner, threats of bodily harm and individual economic disaster made by *union* officers, organizers, and stewards have been found to create an atmosphere in which free and untrammeled choice by employees of their bargaining representative was improbable. (Gabriel Co., 1962, 137 NLRB 1252). An election was set aside in New York Shipping Ass'n., 1954, 108 NLRB 135, where the Board determined that the Union president was aware of violent conduct at the polls by adherents of the union but took no action to have them removed. See also National Gypsum Co., 1961, 133 NLRB 1492.

■ Accepting the standard as applied in previous instances by the Board, we are unable to agree that the threat of physical harm in the present case did not rise to a level considered sufficient to invalidate the elections in the cases we have cited herein.

While the foregoing is sufficient in itself to cause us to conclude we must decline to enforce the Board's order, we consider it very doubtful that the union agent's phone conversation with Scroggins could have had any purpose save to capitalize on the fear of Scroggins that he might lose his job unless he voted for the union. To say that the "laboratory conditions" sought by the Board here existed seems to us to stretch credulity. We cannot agree with the Board's brief that the Board's conclusion that the conversation did not interfere with Scroggins' full choice "was the only possible one that could be drawn."

In fact, we agree with the petitioner that the only conceivable purpose which Fagerhaugh, the union business agent (who was organizing the plant), could have in phoning Scroggins the night before the election, asking him how he was going to vote, and then mentioning that Scroggins' supervisor (Stewart), didn't like him; that "he had never seen one person so set against another" as Stewart was against Scroggins, and that Scroggins had better "watch" himself. This veiled advice, carefully unexpressed as a threat, could well be interpreted as coercive in view of all the circumstances surrounding it, and its particular timing.

The Board's suggestion that Scroggins had vacillated back and forth between "pro-union" and "anti-union" (Ct. 202), adds no *proof* to the conclusion that Scroggins acted free from interference or coercion. It bears both ways on the subject. It might well be maintained his very vacillation rendered him more susceptible to inferential pressure and veiled coercion.[3]

3. "Employees do not stop to look for subtle interpretations or hidden meanings in statements which on their face are rea-

## II

As to the third, or Gonzales incident, at which time a union representative, or "organizer" (if not a union agent), had been present in the immediate vicinity of the polling area at the time of voting, and had engaged employees in conversation, there exists a conflict in the record. Company urges that under Milchem, Inc. 170 NLRB #46, this conduct would be sufficient to constitute election interference, regardless of the nature or content of the conversation.

On its facts, *Milchem* refers to "prolonged conversations" with voters "waiting" in line "to cast ballots", and concludes that "a five minute conversation" was not *de minimis*. Such facts are not here established or suggested.

What was said by Gonzales or those to whom he spoke, as well as the extent of the conversation, are matters in conflict. Just where the parties to the conversation stood is in conflict. Their distance from the polling place is not clearly established. Whether the door to the lunchroom where the election was conducted was open or closed is in dispute.

We decline to speculate on this uncertain record whether Gonzales' conduct, conceded by petitioner to be of "a more minor nature", (Br. p. 29), constituted election interference.

We hold that certain union conduct established by the facts in this second hearing was coercive, and interfered with the employees' free choice. This obviously requires another and proper election, in which the union must be successful, before a new and valid bargaining order can be issued by the Board or enforced by this Court. We decline to enforce the Board's order to bargain and it is set aside, and the matter *remanded* to the Board.

sonably susceptible of coercive implications." G. H. Hess, Incorporated, 82 NLRB, 463, 465.