**SHELL OIL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 71–1741.

United States Court of Appeals,
Ninth Circuit.

March 24, 1972.

David M. Heilbron (argued), Gary H. Moore, of McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., William T. Wise, Houston, Tex., for petitioner.

John R. Tadlock, Denver, Colo., for the charging party.

Daniel M. Katz (argued) Elliott Moore, Marcel Mallet-Prevost, Asst. Gen. Counsel, Peter G. Nash, Gen. Counsel, NLRB, Washington, D. C., for respondent.

Before CHAMBERS and WRIGHT, Circuit Judges, and BYRNE, District Judge.*

WRIGHT, Circuit Judge:

This case is before us on a petition to review and a cross-application for enforcement of an order of the National Labor Relations Board. The Board found that Shell Oil Company refused to bargain with the Oil, Chemical and

---

* Honorable William M. Byrne, Sr., United States District Judge, Cenrtal District of California, sitting by designation.

Atomic Workers International Union. We decline to enforce the Board's order.

## I.

For more than thirty years the Union has been the certified representative of a bargaining unit embracing the Company's production, pipe-line, and refinery personnel in California. The employees work at several facilities within the state: two refineries at Martinez and Dominguez, a gas plant at Molino, a drilling and production operation at Ventura, and production facilities at Signal Hill, Bakersfield, Fellows-Taft, and Coalinga. There are 1,421 employees in the unit, of whom 858 or approximately 60% are members of the Union.

From January 4, 1969, until March 17, 1969, the Union engaged in a strike against the Company. According to a stipulation of the parties, some of the striking employees (though not Union officials or Union representatives) engaged in violence in the form of mass picketing and harassment of employees who had returned to work, both at the gates of the Company's struck facilities and at individual employees' homes. State court temporary restraining orders were issued *ex parte* against continued violence and picketing in Contra Costa and Kern Counties. A preliminary injunction was issued in Los Angeles County after a hearing at which the Union appeared.

The parties stipulated that violence occurred not only during the course of the strike but also for an indeterminate period thereafter. The trial examiner rejected an offer to prove that it continued right up to the date of the examiner's hearing in July, 1970.

On December 29, 1969, nine and a half months after the conclusion of the strike, the acting district director of the Union, V. L. McKendree, wrote to the industrial relations manager of the Company, F. W. Albers, requesting the names and mailing addresses of all unit employees, both Union and non-Union. The Union stated that this request was made because the employees were scattered throughout the state and "there is no alternative method for direct contact on an individual basis to properly discharge the legal and moral responsibilities this Union has to the total of the employees that are affected." It was stipulated that the Union's existing means of communicating with unit employees—handbilling, Union meetings, bulletin boards, etc.—were "ineffective to reach all unit employees because of the scattered location of Respondent's facilities in the unit and the residential dispersion of unit employees."

The Company responded, at a meeting with a Union representative, that it was hesitant to provide the names of the non-Union employees in the bargaining unit because it was concerned about the "harassment of employees that had occurred and the possibility that more harassment would occur if the Union had the names and addresses." The Company did not allege that Union officials or representatives were involved in the violence in any way. The Company's concern was that the names and addresses would fall into hands which the Union could not control.

Because of its concern, the Company asked for a meeting with the district director of the Union, W. J. Forrester. At this meeting Albers again expressed the Company's fear that the list of names and addresses might be misused, saying that "there had been harassment of employees who had returned to work during the strike." Director Forrester stated that he "was aware . . . that some of this harassment had occurred," including one incident involving an employee who had crossed the picket line at the Martinez refinery and who, after transferring to the Anacortes, Washington, refinery in July 1969, had finally quit in August 1969.

After a request that it state its position in writing the Company wrote a letter giving reasons for its reluctance and its belief that it should provide only the names and addresses of those employees who consented.

The Union then filed unfair labor practice charges with the Board.

In an attempt to settle the charges, Albers requested another meeting with Forrester. The two met in June 1970 in Forrester's office. The Company reiterated its concern, referring specifically to "the unrest and the relationships that existed between the Company and the employees and the Union." Forrester said that he was "aware that we were having considerable problems" and that there were "many complaints [which were] unresolved."

Albers then proposed two alternatives to the Company's providing all the names and addresses to the Union, each of which he thought sufficient for the Union's purposes. The first was that the Company provide names and addresses of those employees who consented. The second was that the Company furnish all names and addresses to an independent mailing service which, without disclosing the names and addresses to the Union, would mail all material which the Union wanted to submit and certify this mailing to the Union. Albers also solicited any proposals the Union might wish to put forward, and Union comments on the Company's offers. He indicated a willingness to work out a "mutually agreeable" compromise.

Although invited, Forrester offered no alternative proposals, nor did he seek details of the Company's suggestions. Instead, he informed Albers that the Union wanted the names and addresses of every employee—including non-Union members—and that it was "a matter of principle" for the Union to get them.

At the trial examiner's hearing the next month the Company's proposals were amplified. Albers testified that he knew of responsible commercial mailing services which would assure adequate and confidential mailing access to all employees. The Union could submit material to the mailing bureau in sealed envelopes; Union mailings could be made without limitation as to number; and the Company would pay the extra cost of the mailing service.

The Union responded with testimony to the effect that only a complete disclosure of the names and home addresses would enable it to perform its function of representing all the employees in the unit, including non-Union members. Forrester testified that it was essential for the Union to be able not only to mail communications to the employees but also to have "its leadership" make personal visits to employees' homes in order to organize them, "close to the ranks," canvass their views and opinions on collective bargaining positions and working conditions, and represent them on grievance and industrial accident claims.

The Union also provided testimony that its intent was to limit the disclosure of the names and addresses to its "leadership" and not to permit the list to fall into the hands of the "so-called goons and others to go out and break windows." However, Forrester admitted that not only regional officials would have access to the names and addresses. Presidents and other officers of each of six locals, committees formed "for proper purposes," and, of necessity, clerical personnel who processed the mailings would have access as well.

The General Counsel conceded that *no assurances* had ever been given to the Company by the Union concerning the confidential usage and safeguarding of the names and addresses.

## II.

The trial examiner found that the Company's fear of a leakage and abuse of the name and address list through rank and file harassment of non-Union employees justified the refusal to supply the list to the Union. He reached this conclusion because of the admitted recent violence by "striking employees whom the Union apparently could not control," the absence of any Union assurances of confidentiality and safeguarding, and the fact that, even if such assurances had been given, "the effectiveness of any such procedure to safeguard the name-and-address list from improper disclosure and possible abuse

would be doubtful in view of the number of people to whom it would be available in each of the six locals according to Forrester's testimony." The trial examiner dismissed the complaint.

The Board disagreed. It found that the Company had refused to bargain with the Union and had engaged in an unfair labor practice by refusing to provide the names and addresses of all unit employees.

In reaching its conclusion the Board relied on two points: first, the Company did not contend that the Union leadership was involved in the violence; second, "any Union receiving a list of union employees is under an obligation to take reasonable steps to see that the list is not improperly disclosed or used."

## III.

We observe at the outset of the discussion of the legal issues involved that the Company has behaved in a reasonable and conciliatory manner throughout while the Union has been demanding, arrogant, and intransigent. It would be most anomalous if, under these circumstances, we were to ratify the Board's determination that the Company, rather than the Union, refused to bargain.

The Board asserts that once information is shown to be relevant to the Union's performance of its role as bargaining representative, this fixes the duty of the Company to produce and any failure to produce is *per se* an unlawful refusal to bargain. However, this is not the law. Rather:

> "Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." N.L.R.B. v. Truitt Manufacturing Co., 351 U.S. 149, 153–154, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956).

*Cf.* Emeryville Research Center v. N.L. R.B., 441 F.2d 880 (9th Cir. 1971.)

Several recent cases have compelled employers to furnish names and addresses of all unit employees when the employees were scattered over a wide geographical area and no practical alternative, other than mailing, existed by which the Union could communicate with the employees. *See, e. g.,* United Aircraft Corp. v. N.L.R.B., 434 F.2d 1198 (2d Cir. 1970), cert. denied, 401 U.S. 993, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); Prudential Insurance Co. v. N. L.R.B., 412 F.2d 77 (2d Cir. 1969), cert. denied, 396 U.S. 928, 90 S.Ct. 263, 24 L. Ed.2d 226 (1969); Standard Oil v. N.L. R.B., 399 F.2d 639 (9th Cir. 1968). *Cf.* Excelsior Underwear, Inc., 156 NLRB 1236 (1966).

We note, as urged by the Company, that all of these cases have involved either (1) representation elections or (2) the Union's need for contact by mail with the employees. Since no representation electon is present in this case, the Company argues that its second alternative, the offer of independent mailing service, provides all the information the Union can legitimately demand. However, because of our analysis of the other issues involved in this case, it is not necessary for us to reach this contention.

## IV.

Bearing in mind the admonition from *Truitt*, quoted above, we focus on whether in the circumstances of this case the Company failed to meet its statutory obligation to bargain in good faith.

Only two cases cited to us deal with an employer's refusal or reluctance to provide a list of names and addresses, or equivalent information, out of concern that harassment of employees would result.

In *United Aircraft, supra*, the Company resisted providing a list of names and addresses for fear that the privacy of some of its employees would be jeopardized and that violence and harassment would occur. The court said:

> "In determining whether the disclosure of addresses to a union violates the employees' right to privacy, the crucial factor appears to be the *likeli-*

*hood of a clear and present danger to the employees involved.*" (emphasis added) 434 F.2d at p. 1207.

We agree that this is the proper standard.

The employer's defense in *United Aircraft* was not sustained because the violence there had occurred ten years earlier.

On the other hand, the employer prevailed in Sign and Pictorial Union v. N. L.R.B., 136 U.S.App.D.C. 144, 419 F.2d 726 (1969). There the Union alleged that strike-breakers were being paid higher wages than regular employees had been paid before the strike. It demanded to see the company's payroll records. The company was reluctant to furnish such information (which would necessarily include a list of the replacement workers) without some assurance that the information would not be used "to further facilitate harassment of replacements."

In *Sign and Pictorial* there was a clear and present danger of violence against the replacements. An uncontested Board decision had ruled that replacements had been harassed, threatened and assaulted by some of the striking employees. One of the strikers was later convicted of assaulting a replacement with a gun. In view of the indisputable danger of violence it was found that the Company's refusal to permit the Union to examine its records was not a refusal to bargain.

█ The stipulation of the parties in the case before us and the testimony of Forrester as to the extent of intended distribution of the list of names and addresses within the Union organization, taken together, establish beyond cavil that there was a clear and present danger of harassment and violence in this case. Hence we read both *United Aircraft* and *Sign and Pictorial* as supporting the Company's position.

### V.

We believe that the proper disposition of the instant case is pointed up in our recent decision in Emeryville Research Center v. N.L.R.B., 441 F.2d 880 (9th Cir. 1971). There the Union requested salary grade curves and merit ratings for 430 professional scientists and engineers in the bargaining unit. The Company expressed *its concern over the amount of effort that would be required to compile the requested data and the danger that some of the information sought would destroy the anonymity of material already being supplied.* The Company nevertheless offered to meet with the Union to discuss the requests.

The Company asked the Union to state specifically why it needed the information so that the parties could work together to put it into a form which would satisfy the Union's needs and at the same time meet the Company's objections. The Union responded only that it needed the information in order to bargain intelligently.

The Union made another demand; the Company tendered another reasonable and conciliatory response; and the Union filed an unfair labor practice charge with the Board.

█ We held that the Union is not necessarily entitled to information in the precise form demanded, even when the information is relevant to the performance of the Union's functions as bargaining agent.

█ Three factors, all present in the case before us, moved the court to decline enforcement of the Board's order in *Emeryville*. First, the Company stated specific objections to furnishing the information in the form requested, and there was no suggestion of bad faith or that the reasons given were disingenuous or put forward for delay. Second, the Company did not flatly refuse to comply. Rather the Company offered to discuss the request in the light of the Union's needs and the Company's legitimate interests. Finally, the Union did not take up the offer to discuss a mutually satisfactory form for the information sought. Instead, it went immediately to the Board.

Of course each case must turn on its facts, and this case is not identical with *Emeryville*. But the principle is the same: Presentation of *bona fide* concerns by the Company, coupled with reasonable proposals designed to satisfy the needs of the Union and to achieve a mutually satisfactory resolution of the Union request, is simply not a refusal to bargain. On the contrary this is precisely the conduct the Labor Act is designed to foster. *Cf.* Kroger Co. v. N. L. R. B., 399 F.2d 455 (6th Cir. 1968); Fruit and Vegetable Packers v. N. L. R. B., 114 U.S.App.D.C. 388, 316 F.2d 389, 390–391 (1963); American Cyanimid, 129 NLRB 683 (1960).

■ Moreover, this is especially true when the Company's concern is a desire to protect employees from harassment and violence by Union sympathizers. Harassment and violence are strongly condemned by national labor policy. We have regularly upheld broad orders designed to prevent, limit, and counteract such activities. N. L. R. B. v. Local 85, 454 F.2d 875 (9th Cir. 1972); N. L. R. B. v. Teamsters Local 85, 448 F.2d 789 (9th Cir. 1971); Sonoco Products Company v. N. L. R. B., 443 F.2d 1334 (9th Cir. 1971). We also favor all reasonable steps to protect those who are victims or potential victims of violence.

### VI.

The Supreme Court stated in Universal Camera Corp. v. N. L. R. B., 340 U. S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951):

> "[A] reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." at p. 488, 71 S.Ct. at p. 465.

*Cf.* Arizona Public Service Company v. N. L. R. B., 453 F.2d 228, 230 (9th Cir. 1971).

To the extent that the Board's decision reflects a determination that there was not a clear and present danger of violence and harassment, it is not supported by substantial evidence on the record as a whole. As noted above, the stipulation of the parties and Forrester's uncontradicted testimony establish that there was such danger.

We do not think that a Union duty to safeguard Union membership lists, even when expressed in the Union constitution and even assuming that sanctions would be applied to a failure to safeguard lists of non-Union members, is sufficient to rescue the Board's order.

On this record it would be unreasonable to conclude that the Company was not voicing good faith concern, or that its proposals were not reasonable and serious. It is sufficient to sustain the Company's position that its concern be *bona fide* and its proposals reasonable and serious.

We note specifically that there is nothing in the record to substantiate the Board's assertion in its brief that the company was engaged in an avowed attempt to prevent the Union from increasing its membership. Nor is this assertion consistent with the Company's second alternative proposal.

We hold that the Company did not refuse to bargain. Enforcement is denied.

WILLIAM M. BYRNE (concurring):

I concur in the result.

Although an employer has the "general obligation" of providing the Union relevant information in order that it may effectively represent the unit employees, N. L. R. B. v. Acme Industrial Co., 385 U.S. 432, 435–436, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967), each case rests upon its own facts, "whether or not under the circumstances * * * the statutory obligation to bargain in good faith has been met." N. L. R. B. v. Truitt Manufacturing Co., 351 U.S. 149, 153–154, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956).

I agree with the Trial Examiner that, under the circumstances as shown by the

evidence in this case, including the General Counsel's admission that the Union had not offered any assurance that confidentiality of the list would or could be maintained, the Company's fear of harassment of non-union employees, reasonably justified its refusal to supply the list requested by the Union.