NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The DETROIT EDISON COMPANY,
Respondent.

No. 75–2192.

United States Court of Appeals,
Sixth Circuit.

Argued April 11, 1977.

Decided Aug. 10, 1977.

Rehearing and Rehearing En Banc
Denied Nov. 22, 1977.

Weick, Circuit Judge, dissented and filed opinion.

Elliott Moore, Deputy Associate Gen. Counsel, Aileen Armstrong, Bernard Gottfried, Director Region 7, Director, Detroit, Mich., for appellant.

James E. Brenner, Ralph H. Houghton, Jr., Fischer, Franklin & Ford, Detroit, Mich., John A. McGuinn, Farmer, Shibley, McGuinn & Flood, Washington, D. C., for appellee.

Before WEICK and LIVELY, Circuit Judges; and CECIL, Senior Circuit Judge.

LIVELY, Circuit Judge.

The question in this case is whether the National Labor Relations Board abused its discretion in directing The Detroit Edison Company to deliver to a union which represented certain of its employees the psychological aptitude tests used in determining eligibility for promotion together with the answer sheets and scores of employees who took the tests. After conducting a hearing on an unfair labor practices charge filed by the union the administrative law judge found that the information sought by the union was relevant and would be of use to the union in carrying out its statutory duty as the bargaining representative of the employees and that failure to furnish the requested information was a violation of Section 8(a)(5) of the National Labor Relations Act. The administrative law judge directed Detroit Edison to give to the union the scores of the individual applicants. However, he directed that the tests and actual answer sheets of the applicants be delivered "only to a qualified psychologist selected by the Union to act in its behalf in this matter . . . ." He further ordered that

the psychologist shall be free to fully advise the Union concerning these tests, so that the Union may fully protect the rights of the employees in the appropriate unit; the Union shall have the right to see and study the tests, and to use the tests and the information contained therein to the extent necessary to process and arbitrate the grievances, but not to copy the tests, or otherwise use them for the purpose of disclosing the tests or the questions to employees who have in the past, or who may in the future take these tests, or to anyone (other than the arbitrator) who may advise the employees of the contents of the tests.

Both parties filed exceptions to the decision and order of the administrative law judge, but Detroit Edison limited its exceptions to that portion of the decision and order which required it to turn over to the union actual test scores of identified individual employees. The company did not except to the finding that it had engaged in an unfair labor practice by refusing the union's request for the test materials, but requested the Board "to adopt that part of the order which requires the test be turned over to a qualified psychologist selected by the Union . . . .."

The Board, in its decision and order which is reported at 218 NLRB No. 147, affirmed the rulings, findings and conclusions of the administrative law judge and adopted his recommended order with one modification. It ordered Detroit Edison to supply copies of the tests and answer sheets and scores directly to the union rather than to a qualified psychologist selected by the union, while adopting the restrictions placed on use of the materials by the administrative law judge. The matter is before this court on an application for enforcement filed by the Board and a petition for review filed by Detroit Edison. We conclude that the order of the Board should be enforced.

The dispute in this case arose when Detroit Edison posted notices of six vacancies in the classification of "Instrument Man B" at its Monroe generating plant. Ten employees from the Monroe unit applied for promotion to the posted position, but all failed to achieve the "acceptable" score set by the company on a battery of psychological aptitude tests. The vacancies were filled by promoting employees with less seniority from other units of Detroit Edison who scored at or above the recommended level. The union filed a grievance under the terms of the collective bargaining agreement and requested the company to deliver to it the actual tests that were given and the answers sheets and scores of the employees who took the tests, asserting that these documents were needed in processing the grievance. Though the grievance proceeded to arbitration, the union filed an unfair labor practices charge for failure to furnish the requested information and it was stipulated that the arbitrator's decision would not be final until there had been a disposition of the unfair labor practices charge.

The collective bargaining agreement provided that promotions would be based on seniority "whenever reasonable qualifications and abilities of the employees being considered are not significantly different . . . .." The union conceded in the arbitration proceedings that the company had established the right to use standardized tests as a measure of an employee's qualifications, but contended that it could only police the contract by examining copies of the tests and actual test papers when an issue of fairness related to the testing procedure was raised. Detroit Edison contended that the tests were designed only to predict future success in a particular job and did not measure existing skills and knowledge; therefore, it argued, the sample questions and descriptive literature of the tests together with validation studies were all that would be required to judge its fairness. The company also charged that disclosure of the actual test battery and answer sheets to the union would inevitably lead to dissemination of questions and answers. With respect to the answer sheets and tests scores of individual employees, Detroit Edison claimed "confidentiality" as justification for not turning these documents over to the union. During the unfair

labor practices proceeding the company offered to disclose the actual tests to a qualified industrial psychologist on behalf of the union, to let the union's lay representative take the test and to furnish the answer sheets and actual scores of individual employees if the employees consented.

■ It is the duty of an employer generally to provide to the authorized representative of its employees information which the representative needs to perform its duties. *N.L.R.B. v. Acme Industrial Company*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *N.L.R.B. v. Truitt Manufacturing Company*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); *Kayser-Roth Hosiery Co., Inc. v. N.L.R.B.*, 447 F.2d 396 (6th Cir. 1971); *N.L.R.B. v. Rockwell-Standard Corp.*, 410 F.2d 953 (6th Cir. 1969). Referring to permissible Board action directing an employer to deliver such requested information to a union, the Court in *Acme Industrial Company*, 385 U.S. *supra*, at 437, 87 S.Ct. at 568, said: "It was only acting upon the probability that the desired information was relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities." Matters related to seniority and eligibility for promotion under a collective bargaining agreement satisfy the test of probability of relevance to the duties and responsibilities of the union representing employees under that agreement. Since Detroit Edison unilaterally selected the standardized tests to be included in the examination for Instrument Man B and unilaterally determined the cutoff point below which no applicant would be considered eligible for promotion to that classification, the union was entitled to information about the tests.

■ Without actually contesting the finding that the tests, answer sheets and scores are relevant, Detroit Edison argues, in effect, that the circumstances of this case are such as to require that the tests and answer sheets be delivered only to a qualified psychologist. The Supreme Court held in *N.L.R.B. v. Truitt Manufacturing Company, supra*, 351 U.S. at 153–54, 76 S.Ct. at 756, that "[t]he inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." Detroit Edison points to this court's decision in *Kroger Company v. N.L.R.B.*, 399 F.2d 455 (6th Cir. 1968), as supporting its position. There the court denied enforcement of a Board order which directed delivery to a union of an entire management program which covered many areas of managerial concern other than the specific matter which was in dispute at the time the request was made. The court noted that the union request for disclosure was cast in very broad terms and that there was no showing that the information requested was needed for any currently unresolved grievance. In *Kroger*, the court stated that ". . . it is perhaps significant in this case that the union's showing of need for purposes of collective bargaining is more general and theoretical than immediate and practical." *Id.* at 457. These comments are not descriptive of the present case. The request from the union in this case was in very specific·terms and arose out of an unresolved grievance. Considering "the circumstances of the particular case," *Truitt, supra*, the *Kroger* court concluded that the company did not commit an unfair labor practice in refusing to deliver the requested information.

We have also examined *Emeryville Research Center, Shell Development Company v. N.L.R.B.*, 441 F.2d 880 (9th Cir. 1971), and *Shell Oil Company v. N.L.R.B.*, 457 F.2d 615 (9th Cir. 1972), but they too are distinguishable from the present case. In *Emeryville* the court found that the union's demands were overbroad and its stated reasons for wanting the information were very general, and that the company was not afforded an opportunity to comply because of failure of the union to specify its needs. In *Shell Oil Company v. N.L.R.B., supra*, the court found that the employer had declined to turn over the names and addresses of all employees of a unit to the union because of a *bona fide* concern that nonunion employees would be harassed, as they had been during a recent strike. The court

also found that the company made a reasonable offer of a substitute method by which the union could contact all employees but that the union adamantly refused to retreat from its original demands.

In the present case Detroit Edison argues that the "circumstances of the particular case" are that the actual battery of tests which it uses will be of no value to the union and that if the tests fall into unauthorized hands they will be of no future use to the company though a great deal of effort and expense has gone into their selection and validation. It is possible that the union will not be able to make any determinations about the fairness of the tests by itself and that it will need the advice of a psychologist. Nevertheless, that is a decision that the union should be allowed to make rather than a condition to its right to examine the tests. This may be a case where it would have been better if the union and Detroit Edison had been able to agree upon a neutral party to receive the documents, see *General Electric Company v. N.L.R.B.*, 466 F.2d 1177, 1185 (6th Cir. 1972); but in the absence of such an agreement the Board did not err in dispensing with the administrative law judge's recommendation that the documents be delivered only to an industrial psychologist. The answer to Detroit Edison's concern about the possibility of the tests falling into unauthorized hands is found in the Board's adoption of the administrative law judge's limitations on use of the materials by the union. The restrictions on use of the materials and obligation to return them to Detroit Edison are part of the decision and order which we enforce. Violation of these provisions would be subject to the same sanctions as violation of any provision of a judicially enforced order of the Board. Because of its experience in such matters and its administrative competence the Board is vested with a broad discretion in fashioning remedies. *Fibreboard Paper Products Corp. v. N.L.R.B.*, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). The corresponding scope of judicial review is narrow. *N.L. R.B. v. Local No. 106, Glass Bottle Blowers Association*, 520 F.2d 693, 697 (6th Cir.

1975). Applying these principles, we find no abuse of discretion in the remedy ordered by the Board in the present case.

Both the administrative law judge and the Board ordered the company to give to the union actual test scores linked to the names of the employees who took the tests. The company argues that it would be a breach of confidentiality to disclose the actual scores of employees who did not achieve the recommended grade and that it would "involve probable misuse of such scores, needless embarrassment, humiliation and harassment of those taking the tests." Detroit Edision asserts that it assured each employee who took the test that the scores would not be disclosed, and that management itself has not had access to the scores of identified employees. A similar promise that relevant economic data would not be disclosed to third parties was held in *General Electric Company v. N.L.R.B., supra,* not to present a valid defense when an employer was requested to disclose relevant information to the union. The requirement that the bargaining representative be furnished with relevant information necessary to carry out its duties overcomes any claim of confidentiality in the absence of a showing of great likelihood of harm flowing from the disclosure. *Shell Oil Company v. N.L. R.B., supra,* 457 F.2d at 618–19; *United Aircraft Corporation v. N.L.R.B.,* 434 F.2d 1198, 1207 (2d Cir. 1970), *cert. denied,* 401 U.S. 993, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971).

The company also contends that disclosure of the actual test battery and of the linked test scores would involve its industrial psychologists in a breach of their professional ethical code. The American Psychological Association filed a brief as *amicus curiae* contending that the Board's order ignores the interests of psychologists, the tested employees and future examinees as well as users of the test battery, including Detroit Edison. The court has considered all of these interests and has concluded that the principles which underlie the National Labor Relations Act are para-

mount in this case. Detroit Edison cannot rely upon an asserted privilege which is personal to the employees who took the examination, and we are not informed of any rule of law under which the professional code of the American Psychological Association can stand as a barrier to the right of a duly chosen and certified collective bargaining representative to receive information of use to it in carrying out its duties and responsibilities. The Board showed its consideration for the expressed concerns of the company and the Psychological Association by adopting the limitations on use of the material recommended by the administrative law judge.

The application of the Board for enforcement is granted, and the petition for review is denied.

WEICK, Circuit Judge, dissenting.

The Order of the Board, which the Court enforces, protects only the interest of the union, and does not recognize, or even consider, the conflicting interests of the employer, Detroit Edison. The Board's Order destroys the value for future use of psychological tests which Detroit Edison had validated at great expense, by requiring it to turn over to the union the battery of tests, including the test papers. These test papers were in the custody of qualified psychologists employed by the company (employer), to which papers even company management had no access, and the disclosure of such papers would violate the Code of Ethics of the American Psychological Association which has been recognized by the statutes of the state of Michigan, M.C.L.A. § 338.1001(b); Mich.Stat.Ann. § 14.-677(1)(b).

The Board's Order also required the company to turn over to the union the test scores of each employee who had taken the tests and link to his name his test score, notwithstanding the fact that the psychologists had assured each examinee that such score would be kept confidential and would not be disclosed to anyone without his written consent thereto. None of the examinees had given such consent. A confidential and privileged relationship thus existed between the psychologists who gave the tests and the examinees.

The disclosure of the test papers, as well as the individual scores, would subject the psychologists to the sanctions of disciplinary action which could result in their suspension or even revocation of their licenses by the state of Michigan.

Detroit Edison did, however, furnish to the union a wealth of material, which included: The company's 1970 validation report; the 1972 National Compliance Company validation report; Explanations of the battery of tests given; Representative sample questions from the batteries; the test scores of all of the applicants, but without revealing which examinee received the score.

The company further offered to divulge to the union the name and test score of any examinee who consented thereto, but the union declined to request such consent from any of its members.

The company further offered to permit the union's representative, Mr. Clem Lewis, to take the tests.

The company further offered to turn over to a qualified psychologist selected and employed by the union, all of the withheld material which the union requested. This would have afforded at least some protection to the company, as the union's psychologist would have been bound by the same ethical code as that binding the company's psychologists, but the union even refused to accept this offer.

The Administrative Law Judge did enter a partial protective order which did protect the battery of tests but not the test papers or the names and scores of the examinees who took the tests. This order was as follows:

[T]hat the purposes of the Act will best be effectuated if Respondent be directed to supply copies of the battery of tests administered to the employee applicants for the position of Instrument Man B in this proceeding, including the actual test papers of the applicants (necessary to

check the accuracy of the scoring of the tests), only to a qualified psychologist selected by the Union to act in its behalf in this matter, such submission to be made within 10 days after Respondent receives notification of the individual selected. The psychologist shall be free to fully advise the Union concerning these tests, so that the Union may fully protect the rights of the employees in the appropriate unit; the Union shall have the right to see and study the tests, and to use the tests and the information contained therein to the extent necessary to process and arbitrate the grievances, but not to copy the tests, or otherwise use them, for the purpose of disclosing the tests or the questions to employees who have in the past, or who may in the future take these tests, or to anyone (other than the arbitrator) who may advise the employees of the contents of the tests. After the conclusion of the arbitration proceeding, or if no request is made to reopen the arbitration hearing within 90 days after the psychologist receives the battery of tests, all copies of the battery of tests shall be returned to Respondent. See *Fawcett Printing Corp.*, 201 NLRB 964. (A. 38)

The company filed exceptions only to that portion of the protective order which required the company to turn over to the union the raw test scores, identified by the name of the employee, and the test papers of the applicants.

The material which the company did furnish to the union was, in my judgment, sufficient to permit the union to process adequately the grievance pending before the Arbitrator, or to perform its duties under the collective bargaining agreement. The furnishing of all of the papers requested by the union would have required the assistance of a psychologist to evaluate these papers for the union, and the company was willing to turn over all papers to the union's psychologist, but the union declined to accept such offer. These papers simply could not have been evaluated by a lay person.

This, in my judgment, implies that the union did not wish to be bound by any ethical considerations, but wanted to be free to use the test papers for any purpose it desired.

But even the partial protective order of the Administrative Law Judge, which order was little enough, did not satisfy the Board. The Board reversed the partial protective order and ordered that the company turn over all of the material requested, but imposed upon the union the same conditions as those which the Administrative Law Judge imposed on the psychologist. This was really naive. Member Kennedy dissented, stating:

The majority's modifications of the remedy recommended by the Administrative Law Judge are not justified. There is no professional obligation on the part of the union not to publicize the tests or their results. I do not see how this Board can enforce its exhortation not to copy or to disclose the tests.

Detroit Edison was vitally concerned in securing qualified applicants for a critical position. Its testing program has been nullified by the action of the Board. In a case where the union had requested information which was too broad and covered many facets of managerial concern, we stated in an opinion written for the Court, by Judge Edwards, in *Kroger Co. v. NLRB*, 399 F.2d 455, 457 (6th Cir. 1968):

To us the critical problem appears to be how to recognize and how adequately to protect each of the conflicting interests that are involved here.

These interests include the company, the examinee, and the psychologists. In *Kroger* we set aside the Board's order and denied enforcement.

Since the Board did not follow the criteria of *Kroger*, but recognized and enforced only the interest of the labor union, its order constituted a gross abuse of discretion and it ought not to be enforced.