633 F.2d 766
 105 L.R.R.M. (BNA) 2912, 89 Lab.Cas. P 12,333
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, INC., Respondent,
and
46 Northern California Counties Conference Board, United
Brotherhood of Carpenters and Joiners of America, AFL-CIO,
and
Northern California District Council of Laborers, Laborers'
International Union of North America, AFL-CIO, Intervenors.
 No. 79-7484.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 9, 1980.
Decided Oct. 16, 1980.
Rehearing Denied Dec. 22, 1980.
 
 Jerrold J. Wohlgemuth, Washington, D. C., for petitioner.
 James P. Watson, Los Angeles, Cal. (on brief), for respondent.
 Victor J. Van Bourg, Van Bourg, Allen, Weinberg & Roger, San Francisco, Cal., for intervenor.
 On Application for Enforcement of an Order of the National Labor Relations Board.
 Before WRIGHT and POOLE, Circuit Judges, and BROWN, Senior District Judge.*
 WRIGHT, Circuit Judge:
 
 
 1
 The National Labor Relations Board ordered a multi-employer bargaining agent to furnish a complete roster of its members to two unions.[1] The issue is whether a refusal to disclose the roster was a failure to bargain in good faith. We modify the Board's order, and enforce it as modified.
 
 
 2
 * Associated General Contractors of California (AGC) is a trade association performing various services for its member contractors. Prior to 1971, it had five membership classifications: Regular, Specialty, Joint Venture, Affiliate, and Honorary. Pursuant to AGC's Bylaws, only the Regular, Specialty, and Joint Venture members conferred authority on AGC to engage in collective bargaining and enter into collective bargaining agreements on their behalf.
 
 
 3
 In 1971 AGC added an Open Shop classification. Under AGC's amended Bylaws, a contractor may not be admitted as an Open Shop member if it is subject to any existing collective bargaining agreement. Open Shop members give no collective bargaining authority to AGC.
 
 
 4
 In 1976 AGC added an Open Shop Specialty classification, under terms similar to those applicable to the Open Shop classification.
 
 
 5
 The Carpenters' Union[2] and the Laborers' Union[3] have engaged in collective bargaining with AGC since 1942. Each union entered into a three-year Master Agreement with AGC in 1974.
 
 
 6
 The Carpenters' contract bound every Regular, Specialty, and Joint Venture member of AGC. The Laborers' contract was unclear as to which employers it purported to cover. The unions contend it bound all AGC members. AGC argues only Regular, Specialty and Joint Venture members were covered. The Board did not decide the issue. We assume, without deciding, that Open Shop and Open Shop Specialty members were not bound solely by virtue of their AGC membership.[4]
 
 
 7
 Both contracts contained provisions binding employers regardless of changes in the name, style, or address of their businesses.
 
 
 8
 Following negotiation of the 1974 contracts, AGC sponsored seminars on the operation of open shops, including methods of converting from union to open shops, and of operating both union and open shops (double-breasted construction).
 
 
 9
 The union became concerned about the growing number of open shop contractors. AGC's open shop membership increased from 10 in 1974 to 60 in 1978. Employer contributions to union trust funds decreased, despite industry-wide increases in construction volume and employment.
 
 
 10
 The unions believed AGC members subject to the collective bargaining agreements (approximately 550) would transfer classifications or establish a second, open shop operation. They set up an elaborate system to check the identities of newly licensed firms. They have identified one California contractor (not an AGC member, however) which changed its name 18 times in nine months.
 
 
 11
 They have pointed to three instances in which an AGC member bound by the Master Agreement shared common ownership with an open shop contractor. In at least one of those cases, however, the Regional Director of the Board has determined the open shop contractor was not the "alter ego" of the union shop contractor and, thus, not subject to the Master Agreement.
 
 
 12
 As the end of the 1974 contracts neared, the Carpenters requested a roster of AGC's entire membership. Subsequently, both unions made this request, asserting they needed the full roster in order to: (1) monitor name changes pursuant to the contract provisions; (2) identify employers who transfer from one membership classification to another; (3) enforce their position that all AGC members were bound by the Laborers' contract; (4) facilitate bargaining by identifying who AGC represented; and (5) police and enforce the contracts.
 
 
 13
 AGC regularly provides the unions with rosters of its Regular, Specialty, and Joint Venture members, and updates those rosters from time to time. It refused, however, to provide a full membership roster.
 
 
 14
 The unions filed charges with the Board in January of 1977, alleging AGC had failed to bargain in good faith. They also entered into new three-year Master Agreements with AGC, containing the same provisions as the 1974 agreements on name and style changes and on employer coverage.
 
 
 15
 After a hearing, an Administrative Law Judge dismissed the charges. He found the "basic failing" in the unions' position to be the absence of language in the collective bargaining agreements identifying the employers that are covered. He apparently felt the reason the unions wanted the roster was to engage in "the notorious top down mode of organizing" open shop employees. He did not, however, make explicit findings of fact or conclusions of law.
 
 
 16
 The Board found the full roster relevant to the unions' performance of their statutory duties. The full roster was necessary to enable the unions to investigate the possibility of unlawful double-breasted construction, to assess the advisability of initiating grievances or taking other remedial action, and to formulate contract proposals regarding employers to be covered by the Master Agreements.
 
 II
 
 17
 The legal principles which govern this case are well settled. The duty to bargain in good faith, imposed by § 8(a)(5) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(5) (1976), may be violated by an employer's refusal to furnish information relevant to the union's negotiation or administration of a collective bargaining agreement. Detroit Edison Co. v. NLRB, 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979); NLRB v. Acme Industrial Co., 385 U.S. 432, 435-36, 87 S.Ct. 565, 567-68, 17 L.Ed.2d 495 (1967); NLRB v. Truitt Manufacturing Co., 351 U.S. 149, 152, 76 U.S. 753, 755, 100 L.Ed. 1027 (1956).
 
 
 18
 Information relevant to the filing or processing of grievances is relevant to contract administration. Acme Industrial Co., 385 U.S. at 436-38, 87 S.Ct. at 568-69; NLRB v. Goodyear Aerospace Corp., 388 F.2d 673 (6th Cir. 1968).
 
 
 19
 Whether there has been a violation turns upon the facts of the case. Truitt, 351 U.S. at 153-54, 76 S.Ct. at 756; Shell Oil Co. v. NLRB, 457 F.2d 615, 618 (9th Cir. 1972). See Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401 (1958).
 
 
 20
 Although only relevant information must be disclosed, a refusal to disclose even relevant information is not always a § 8(a)(5) violation. Emeryville Research Center v. NLRB, 441 F.2d 880, 885 (9th Cir. 1971) (problem is one of accommodating competing interests); Shell Oil, 457 F.2d at 618. See Gorman, Basic Text on Labor Law, 417-18 (1977). The employer's reasons for nondisclosure and the negotiating conduct of the parties must be considered. See Shell Oil, 457 F.2d at 618.
 
 A.
 
 21
 The threshold question is whether the information sought is relevant to the unions' duties. The Board and the courts have employed a liberal, discovery-type standard of what constitutes relevant information. Acme Industrial Co., 385 U.S. at 437, 87 S.Ct. at 568; San Diego Newspaper Guild v. NLRB, 548 F.2d 863, 867 (9th Cir. 1977).
 
 
 22
 The Board's determination on this issue is given great weight, either because it is a finding of fact, which is conclusive if supported by substantial evidence, or because it is a finding on a mixed question of law and fact which is within the expertise of the Board. San Diego Newspaper Guild, 548 F.2d at 867.
 
 
 23
 The information sought by the unions does not fall within the category of information that is presumptively relevant4a and, thus, the unions had the initial burden to show relevancy. San Diego Newspaper Guild, 548 F.2d at 867-68. They introduced evidence establishing an increase in the number of open shop contractors, AGC sponsorship of seminars instructing contractors on conversion from union to open shops, and common ownership of some union and open shop contractors.
 
 
 24
 Two or more employers, if they are "alter egos," may be treated as a single employer under the NLRA. If one is subject to a collective bargaining agreement, the others will be bound by it. See NLRB v. Don Burgess Construction Corp., 596 F.2d 378, 384-86 (9th Cir.), cert. denied, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). AGC emphasizes that common ownership alone will not bind the open shop employers. See id. at 384 (common ownership one of four factors considered).[5] Under the facts of this case, however, the unions have met their initial burden by showing that the information sought is relevant to investigations of contract violations, and that there is a reasonable basis for further investigation.[6]
 
 
 25
 AGC makes three arguments to rebut this showing: first, no actual violations have been established; second, the roster will not aid the unions in uncovering contract violations; and third, the unions really want the roster in order to engage in organizational activities.
 
 
 26
 The first argument misconstrues the standard to be applied. It is sufficient that the information sought is relevant to possible violations where the union has established a reasonable basis to suspect such violations have occurred. Actual violations need not be established in order to show relevancy. See Acme Industrial Co., 385 U.S. at 437-39, 87 S.Ct. at 568-69; P. R. Mallory & Co. v. NLRB, 411 F.2d 948, 954 (7th Cir. 1969).
 
 
 27
 The second argument concerns the usefulness of the rosters. If employers subject to the agreements are operating open shops under different names and addresses, AGC argues, the rosters will be of no assistance in identifying them. Moreover, several factors must be considered to determine whether an open shop contractor is the "alter ego" of a union shop and thus bound by the agreement. AGC argues the roster will not aid materially in evaluating those factors.
 
 
 28
 Again, however, AGC seeks to impose an excessively stringent standard. It is not essential that the information fully resolve the question whether a contract violation has occurred. The roster would enable the unions to investigate specific Open Shop members, rather than having to examine all 550 Regular, Specialty, or Joint Venture members, or all newly licensed contractors. It is sufficient under a liberal discovery standard that the roster would aid in the unions' investigation of contract violations.
 
 
 29
 Third, the potential use of the roster for organizational purposes does not make it irrelevant to the unions' duties in administering the contract. AGC cites NLRB v. A. S. Abell Co., 624 F.2d 506 (4th Cir. 1980), which held an employer's showing of prior misuse of requested information rebuts a presumption of relevance. The court also held, however, that the information could be obtained if the union, as here, made an affirmative showing of relevance.[7]
 
 
 30
 Moreover, there has been no showing of prior misuse here. Although we give some consideration to the ALJ's "finding" that the unions were interested in "top down" organizing, substantial evidence on the record as a whole supports the Board's findings of relevance.[8]
 
 B.
 
 31
 As noted, failure to disclose relevant information is not necessarily a failure to bargain in good faith. Several factors have been urged by AGC and Amicus, the National Association of General Contractors, as justifying AGC's refusal to supply the roster. Specifically, they claim disclosure would violate their members' First Amendment rights, and subject them to violence and harassment. AGC argues the importance of disclosure is lessened since it already reviews Open Shop applicants to insure they are not subject to existing collective bargaining agreements.
 
 
 32
 Nothing in the record supports AGC's concern that the unions will engage in violent, harassing, or unlawful conduct. The First Amendment cases cited by Amicus, N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) and Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), are therefore inapplicable.[9] There is no "clear and present" danger justifying a refusal to supply the roster. See Shell Oil Co. v. NLRB, 457 F.2d 615, 618-19 (9th Cir. 1972).
 
 
 33
 AGC's independent review of Open Shop applicants also does not justify nondisclosure. That review is not responsive to the unions' needs: information from which to make its own determination regarding possible contract violations. See Curtiss-Wright Corp. v. NLRB, 347 F.2d 61, 70 (3d Cir. 1965).
 
 
 34
 Disclosure of the rosters of Open Shop and Open Shop Specialty members does not impose an onerous burden on AGC. See Prudential Insurance Co. v. NLRB, 412 F.2d 77, 85 (2d Cir.), cert. denied, 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969). No persuasive reason for nondisclosure is established in the record, nor has AGC proposed any practicable alternative to disclosure. Its refusal to provide the roster was therefore a failure to bargain in good faith in violation of § 8(a)(5).[10]
 
 III
 
 35
 The Board ordered AGC to furnish the unions with a full membership roster. The record establishes the relevancy, however, of a roster of Open Shop and Open Shop Specialty members only. We modify the Board's order to include only those membership classifications.
 
 
 36
 The Board's order is enforced as modified. It may present a judgment in accordance with this opinion.
 
 
 
 *
 Of the District of Kansas
 
 
 [1]
 242 NLRB No. 124 (June 8, 1979)
 
 
 [2]
 46 California Counties Carpenters Conference Board, United Brotherhood of Carpenters & Joiners of North America, AFL-CIO
 
 
 [3]
 Northern California District Council of Laborers, Laborers' International Union of North America, AFL-CIO
 
 
 [4]
 If such members were bound under the terms of the agreements, a roster of their names and addresses clearly would be relevant to the unions' duties. See Part IIA, infra
 4a Information directly relating to unit employees (e. g., wages, related financial benefits) is deemed presumptively relevant, and the employer has the initial burden to rebut that presumption. See San Diego Newspaper Guild, 548 F.2d at 867-68.
 
 
 [5]
 The open shop employers may be bound by operation of the change of name and style provisions in the Master Agreements. Although we need not decide the question, we note that the standard which applies under those provisions may not be the same as that applied under the Act to determine whether an open shop contractor is bound
 
 
 [6]
 A reasonable basis for further investigation is sufficient under a discovery standard. Cf. Fed.R.Civ.P. 26(b)(1) (discoverable information need only appear "reasonably calculated to lead to the discovery of admissible evidence"). A major purpose of the labor laws is to promote peaceful resolution of labor disputes, and it furthers that purpose to permit unions to have access to information needed to investigate alleged violations prior to initiating full-scale grievance proceedings. Acme Industrial Co., 385 U.S. at 437-39, 87 S.Ct. at 568-69; P. R. Mallory & Co. v. NLRB, 411 F.2d 948, 954-56 (7th Cir. 1969)
 AGC relies on our decision in San Diego Newspaper Guild v. NLRB, 548 F.2d 863 (9th Cir. 1977), in which case the Board determined the employer had not failed to bargain in good faith when it refused to provide information concerning its training of persons to perform bargaining unit tasks in the event of a strike. We held:
 the showing by the union must be more than a mere concoction of some general theory which explains how the information would be useful to the union in determining if the employer has committed some unknown contract violation. Id. at 868.
 We noted, however, that to require an initial, burdensome showing would frustrate the purposes of the liberal discovery standard. Id. at 868-69. We emphasized that great weight should be given the Board's determination. Id. at 869.
 We reach a different result here, as did the Board, because the cases are factually distinguishable. In upholding the Board's decision, the San Diego court referred to five factors. Id. The union had introduced no evidence to support its claim that contract violations might be taking place, and failed to contradict the employer's testimony to the contrary. It failed to show it had taken steps to investigate possible violations. Its suspicion had "been shown by the record before the Board to be totally unfounded." Id.
 Here, the unions have shown an objective basis for their suspicions. They have provided concrete examples, and they have taken other steps to investigate possible violations. Clearly, the record before the Board did not show their suspicions to be "totally unfounded."
 
 
 [7]
 The union presented nothing more than a "bare assertion" that it needed the information. 624 F.2d at 510
 
 
 [8]
 The ALJ never addressed the question whether the roster was relevant to uncovering unlawful double-breasted operations. We agree with the Board that its conclusion on that issue is based not on a credibility determination, but on derivative inferences drawn from its broad experience and expertise. See Penasquitos Village, Inc. v. NLRB, 565 F.2d 1074, 1078-80 (9th Cir. 1977)
 
 
 [9]
 The Board's order does not run afoul of the First Amendment. Any attempt to reconcile an asserted governmental interest in disclosure with First Amendment rights must be made in the context of the labor relations setting. NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). Association that would otherwise be protected may be regulated if necessary to protect substantial rights of employees or to preserve harmonious labor relations in the public interest. Id. Those interests outweigh any minimal interference with associational rights which might be present here. We note that AGC publishes the names of its members in trade journals and public media, albeit not its membership classifications. The record does not support its claims that disclosure of the roster will have an adverse impact on its membership
 
 
 [10]
 Amicus argues that the unions have waived their right to obtain the roster. That argument is clearly without merit. See Gorman, Basic Text on Labor Law, 418 (1977)